# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEBRASKA

In Re:                                                  Bankruptcy No. 13-40219-SH

Sandpoint Cattle Company, LLC,                          Chapter 11

      Debtor.

_____/

Sandpoint Cattle Company, LLC,

      Plaintiff,

vs.                                                     Adversary No. 14-04052-SH

Robert Craig, Robert F. Craig
P.C. d/b/a/ Craig/Bednar Law
P.C., and Anna M. Bednar,

      Defendants.

_____/

## MEMORANDUM AND ORDER

Debtor/Plaintiff Sandpoint Cattle Company, LLC brought this adversary

proceeding by Complaint filed on October 6, 2014.  In its Complaint, Debtor

asserts a legal malpractice action against Defendants Robert Craig and Robert

F. Craig P.C. d/b/a Craig/Bednar Law P.C.  Debtor alleges Craig and his firm

breached the standard of care in their representation of Debtor in its bankruptcy

case.  Specifically, Debtor asserts Craig informed Debtor that its debt to a

secured creditor would be reduced by the appraised value of the cattle if Debtor

abandoned its cattle to the creditor.  Debtor claims it relied on Craig's advice and

abandoned the cattle.  Debtor also alleges that Craig failed to negotiate certain

1

agreements that would have ensured Debtor received appropriate credit for the cattle abandoned.  Debtor claims Craig and the firm's negligence resulted in approximately $5,000,000 in damages.  Debtor filed the First Amended Complaint on October 23, 2014.

Defendants filed an Answer on November 5, 2014, denying Debtor's allegations and seeking dismissal of the Complaint.  Defendants affirmatively alleged that the Complaint fails to state a cause of action upon which relief may be granted, Debtor failed to mitigate its damages, Debtor lacks standing to recover fees paid by third parties, and Debtor's claims are barred by collateral estoppel and/or res judicata.  Defendants filed a substantially similar Answer to Amended Complaint on February 20, 2015.

Debtor filed Plaintiff's Motion for Leave to Amend Complaint on January 30, 2015.  Debtor sought to amend its First Amended Complaint to add additional factual allegations it discovered through preliminary discovery.  It further sought leave to amend "to add additional parties who may be necessary to this action as a result of an affirmative defense stated by defendant."  Doc. 20.  Defendants resisted the motion.  After a hearing, the Court granted Debtor's request to add new claims and allegations and denied Debtor's request to add new parties. Doc. 30.

Debtor filed a Second Amended Complaint on March 10, 2015, which included new claims and allegations.  Despite the fact that the Court denied Debtor's request to add additional parties to its pleading, Debtor also added

2

Anna M. Bednar to the caption of the Second Amended Complaint.  Defendants filed an Answer on March 24, 2015.

In addition to the affirmative defenses previously alleged, Defendants added the allegation that Neb. Rev. Stat. § 25-21,185.07 et seq. bars Debtor's negligence claims.  Specifically, Defendants affirmatively allege Debtor's contributory/comparative negligence, including its failure to follow legal advice, was in an amount equal to or greater than the negligence of Defendants, if any.

Debtor filed Plaintiff's Motion for Leave to File Third Amended Complaint and Motion to Allow Intervention Pursuant to B.R. 2018 on March 31, 2015.  Doc. 36.  Defendants objected.  Doc. 38.  After a hearing, the Court denied both motions.

The case is before the Court on Defendants' Motion for Summary Judgment filed on August 31, 2015.  Defendants argue Debtor should be judicially estopped from offering evidence that contradicts evidence Debtor previously presented in its bankruptcy case.  Defendants further argue that if Debtor is judicially estopped from presenting this evidence, it cannot prove that Defendants' alleged malpractice was a proximate cause of any damage to Debtor and Debtor's malpractice claim fails. Defendants claim they are entitled to judgment as a matter of law.

For the reasons that follow, Defendants' motion is denied.

## I.   FACTUAL BACKGROUND

Michael Deutsch and his investment group created Debtor in 2008 to purchase an Angus cattle seed stock operation located on a 12,000-acre ranch in Lodgepole, Nebraska.  Debtor purchased the ranch and its assets, including cattle, from Alger Cattle Company, LLC.  As part of the purchase agreement, Alger loaned Debtor $10,800,000 at 5 percent annual simple interest in exchange for a security interest in real and personal property, including the cattle.  Under the terms of the promissory note, Debtor promised to pay Alger $600,000 annually from 2008 until 2012, and $800,000 annually from 2013 to 2016.  As part of the purchase agreement, Debtor also retained John Widdowson to continue to run the ranch.  Widdowson previously ran the day-to-day operations for the ranch on behalf of Alger.

Debtor began missing payments under the purchase agreement shortly after Debtor and Alger signed the purchase agreement.  Debtor's failure to make timely payments was attributable, at least in part, to a severe drought in western Nebraska.

Debtor filed for relief under Chapter 11 of the Bankruptcy Code on February 6, 2013.  Robert Craig and Anna Bednar represented Debtor in the bankruptcy case.  Alger filed proofs of claim in Debtor's bankruptcy case, asserting a secured claim against Debtor in excess of $12 million.

Debtor filed its first motion for use of cash collateral on February 13, 2013.  Debtor's ranch inventory included approximately 2,706 head of cattle at

4

the time of filing.  It sought the use of cash collateral to maintain the cattle herd, among other things.  The Court[1] granted the motion over the objection of Alger and Raymond Alger and Mary D. Alger, Trustees of the R. and M. Alger Family Trust, creditor (collectively, "the Alger interests").  It granted Debtor permission to use cash collateral through March, 3, 2013, and set a final hearing for February 27, 2013.

After the final hearing, the Court denied the motion for use of cash collateral for failing to adequately protect the value of the Alger entities' collateral.

Debtor filed a second motion for use of cash collateral on March 11, 2013.  After a preliminary hearing, the Court entered a text order deferring the motion until the final hearing on March 26, 2013: "The equity interests have contributed $70,000 since the first motion for use of cash collateral was denied. The court was informed at the hearing that the equity interests have the ability to and are willing to contribute additional funds to protect the interest of Alger." Doc. 83 (13-40219).  The Court granted the second motion for use of cash collateral after the final hearing, over the objection of the Alger interests.

Debtor filed a third motion for use of cash collateral on June 5, 2013, seeking use of cash collateral through August 31, 2013.  At the hearing on the motion on June 26, 2013, Widdowson testified that Debtor was contemplating a meaningful reduction in the size of Debtor's herd within the next 60 days.  Doc.

---

[1] Hon. Timothy J. Mahoney.

90-3 at 20:16-21 (13-40219).  He stated that a significant reduction in inventory would "reduce the expenditure side considerably."  Id. at 21:1-12.  The Court granted the motion.

On June 28, 2013, Debtor filed a motion to abandon collateral to the Alger interests.  Specifically, Debtor sought authorization to abandon 2,453 head of cattle to the Alger entities.  Debtor filed an amended motion to abandon on July 10, 2013, increasing the number of head of cattle it sought to abandon to approximately 2,376.  Debtor asserted that the cattle it intended to abandon were "of inconsequential value to the bankruptcy estate because [they] were 100% encumbered by the Alger Interests, and any benefit generated by the property" would inure only to the Alger interests.  Doc. 165 at 3 (13-40219).  Debtor further asserted that "the expense that the bankruptcy estate would incur maintaining and selling the cattle is, and would continue to be, burdensome."  Id.  Debtor also consented to relief from the stay for the Alger interests.

The Alger interests consented to the abandonment of 2,376 head of cattle.  In fact, it encouraged the abandonment.  They filed a request for a limited modification to Debtor's motion, however.  They requested the Court "modify the proposed timing and method of abandonment set forth in the Debtor's Motion because of the necessity to maintain the value of the collateral, to sell the collateral in a reasonable manner and thereby maximize the potential proceeds that may be realized from the sale of the collateral."  Doc. 188 at 2

(13-40219).   Specifically, the Alger interests wanted the cattle to remain on

Debtor's ranch while the Alger interests made preparations for the transfer and

sale of the cattle.  They stated: "Although this review is on-going, the Secured

Creditor currently believes that public sale should be marketed for

approximately 90 to 120 days and be conducted at the current location."  Id.

Widdowson testified at the hearing in support of the motion to abandon:

> In my opinion, a large portion of the reason for the abandonment of the cattle is no matter who has possession of the cattle, whether it be the debtor or the creditor in this situation, they have to leave. This ranch has been now through almost 18 months of drought. The drought has only gotten worse, and I have no foreseeable end to it yet.  Your Honor, you know law, but I could take anybody in this courtroom with me, drive through that ranch, and anybody here could see what I'm talking about.  There is not grass.  It's not there.
>
> And, you know, we've stretched the asset of the land resource, Your Honor, as far as we possibly can.  It hasn't rained significantly enough for the last 18 months.
>
> We've used up every bit of extra resource that we've had to maintain the collateral to the best of our ability and also protect the collateral and the asset of the land.  But we're at that point in time where some drastic changes need to be made.  We cannot hold it together with the current beating situation that we're in.  So again, as I say, no matter who has possession of the cattle, they need to go to a different location, probably—you know, properly take care of them and feeding them in a way that we all want in the best interest of the cattle.

Doc. 90-4 at 15-16.  He continued:

> We've been under the thought process and the business model that the last week of July or somewhere in there, we would be—these cattle would be leaving the ranch in allowance of us to get ready for those other cattle that we are going to wean and put in those pens. We typically don't have cattle in those pens.  And so for lack of a better analogy, the hotel's full and we've got to bring in next

weekend's occupants and we've got to kick the other ones out. I mean, it's not just one day, open the gate and move them out and move the other ones in. We need time to prepare those pens. We need to do some repairs, get them in the best shape we can, and that's a process. And, you know, operationally, you know, we've kind of had this scheduled for the last three days that this is what was going to happen with the abandonment, and we've got the next two or three, four weeks already scheduled with the thought process of those cattle leaving, preparing to get the next draft of cattle that we will return to Mr. Alger, plus being able to maintain the collateral that we're going to keep and doing it in the right process. So for lack of, again, another term, we're going to have a major logjam in the next two weeks with inventory if something is not done.

Id. at 17-18. Widdowson explained:

You know, we're just running out of margin, your Honor. I mean, we—last year was a drought, but we had a great year before, so we had some reserves. We had some carryover grass. We had some options. We had flexibility. We've exhausted all those reserves. I mean, we didn't have near the—for example, we are running about 50-percent less cows out in the pasture out grazing than we did last year. We haven't reduced the numbers at all. Based upon the purchase agreement and the requirements that I have to maintain the collateral, I still have to keep the cattle, but we are not able to use the asset of the land to take care of them just because the land ain't got the grass to do it.

So our pens and our facilities are maxed out due to the drought. And now, when we take those calves that we need to wean 1st of September, we really don't have the facilities to go with them unless we move those cattle out.

Id. at 30-31. When asked what he was going to do with the cattle, he said:

I wish I could sit here and say these are all choices that I've made. No, I'm reacting to what we've been dealt with and we're trying to manage and reduce the amount of the risk and the negative effects. So, you know, one thing that I'm really struggling with is forecasting the feed resources that we're going to need going forward. You know, if we need to maintain this collateral for another 90 to 120 days, we've never had to feed this many cattle ever. The consumption of feed that we will use will be enormous, and it will

only compound what will happen after the first of the year.  You know, we're going to use up so much of our resources that the ranch can provide that the effect of having to go out on the open market and buying commodities to feed these cattle would even be more time.  It'll be a longer deal.

So that's what I'm really concerned about is we just don't have no reserves.  We've used up all the extra that we had, and at some point in time, Your Honor, we're stewards of the land.   And at some point in time, we have to protect the land, and we're at that point now.  There are spots where it's just—there's nothing there, and we will do some damage to this land if we keep doing this.  It could take years to rebuild.  Might not just take three months, it could take years.

And that's why I think something needs to happen now is because we were hopeful that in April and May that this thing would turn around.  I don't see an end to the drought yet, and once that end comes, we're going to need some time just for adequate or even above-adequate moisture just to let it catch its breath and go.

So again, I wish it was just me saying these cattle have got to leave, but they've got to based upon the ranch.  I mean, the ranch is the driving force here.

Id. at 31-32.  As to the suggestion that the abandoned cattle could remain on

Debtor's land:

But again, we have to move the cattle off the ranch because the ranch cannot support them.  So it does not make sense that if we abandon the cattle and Mr. Alger gets them back that we turn around and restock the ranch.  That doesn't make sense.  That's not what we're doing this for.  So there's going to be some time period here where we're going to run the ranch, you know, at a very low number, but it needs to be that way for a period of time.

Id. at 38.  Specifically, Widdowson testified that "even if we would cut and

feed every bit of corn we have, we would still not have enough anyway."  Id. at

40.  He reiterated, "[W]e have no reserves left on the ranch, and if we are

9

going to maintain that many head, there will be some—you know, there's

going to be some things done to that ranch." Id. at 42.  In summary:

> I think I have great management skills.  I have a team and staff of people that I won't trade for anybody else, but we can't make it rain. We can't make the grass grow.  We can't make the pens overnight double their capacity.  And I feel like by returning Mr. Alger a large portion of his collateral, it takes care of a lot of the responsibility and gets him a large portion of what's owed him.  So that's the plan that ownership has decided to go, and I'm here to try to help execute that.

Id. at 60.

Among the major considerations regarding abandonment was that the

cows were going to start calving:

> Towards the end of August, a portion of that inventory is going to calve.  And so as we sat down and put this plan together, the well-being of the cattle was our first and foremost priority.  And as I've stated many times to you, Bob, timing is of the essence and it's very, very important.
>
> So we need to get these cattle out so that they have time to adjust and to acclimate so that they are ready to birth.  These cattle are going to have to be moved where they're at today.  Whether we keep possession of them or the creditor has possession of them, those cattle that are going to calve are going to have to be moved because where they're at, they will not calve there.  They cannot calve there.  They're in a confinement pen that is suffice [sic] for what they are, but it will not be suffice for the calving and the birthing process.

Id. at 40-41.

Widdowson also testified about the unavailabity of Conservation Reserve

Program (CRP) land:

> We've looked at other things, as far as the CRP and all that kind of stuff, whether that was going to be released again, and yes, it's been

released again. So as I went there and talked to see if that was going to be an option again, they're not going to allow us to go back to the same fields that we grazed the previous year. So that option, as far as mitigating some of the drought, basically was evaporating on us.

Id. at 45-46.

The Court granted Debtor's motion to abandon, finding on the record:

The only evidence I have here concerning whether the cattle should or could or can or may stay on the ranch is that they cannot. Ranch can't support them. Mr. Craig did stand up at the last hearing and say, we're going to give back a significant proportion of cattle, so we've had 30 days or almost 30 days for somebody to do something about this particular thing.

I'm not—I accept Mr. Widdowson's testimony that the cattle cannot remain on the premises.

Id. at 70. Significantly, whether Debtor could sustain the cattle—either on the ranch or otherwise—was not the issue before the Court. Rather, the issue under section 554 of the Bankruptcy Code was whether the cattle were burdensome to the estate or of inconsequential value and benefit to the estate. The Court granted the amended motion to abandon 2,376 head of cattle and ordered the Alger interests to remove the cattle in two stages, the first group by August 2, 2013, and the second group by August 13, 2013.

On August 8, 2013, the Alger entities filed a motion to compel debtor to comply with the abandonment order. As of that date, Debtor had abandoned 1,321 cattle to Alger. In opposition to the motion to compel, Debtor offered the affidavit of Widdowson, who testified that the fair market value of the projected number of cattle to be abandoned exceeded the value of Alger's secured claim.

Doc. 220 at 2.  Therefore, Debtor planned to retain 261 head of cattle in addition to the 500 head Debtor initially intended to retain after the abandonment.  Id. at 2-3.  In Widdowson's opinion, Debtor's "capacity would not be adversely stressed by retaining this limited number of additional cattle." Id. at 3.  He did, however, reaffirm his prior testimony at the hearing on the motion to abandon:

> I acknowledge that, during the July 24, 2013 hearing on Debtor's Motion to abandon, I testified to the effect that Sandpoint was not able to sustain the number of cattle that it had and that drastic changes needed to be made due to a drought that had extended for some eighteen months.  I further testified to the effect that the most reasonable approach would be to abandon the excess cattle, and that whoever had possession of those cattle needed to move them somewhere else.  I hereby reaffirm that testimony.

Id. at 2.

After a hearing, the Court granted the motion to compel, stating on the record:

> But I don't think it's appropriate when we have a trial we have testimony that I can't feed 2,376 head of cattle, I can't feed them and I've got to abandon them, I want them out of here, when you folks just decide on your own well we're not going to do that because we'd be giving them too much money.  That hasn't been determined.

Doc. 90-5 at 30.

The Court[2] held an evidentiary hearing from March 10, 2014, to March 13, 2014, on Debtor's objections to the claims filed by Alger.  At the hearing, Widdowson testified about the abandonment:

---

[2] Hon. Michael J. Melloy, sitting by designation, due to the retirement of Hon. Timothy J. Mahoney.

Q     In July of 2008 [sic] was the ranch able to sustain these cattle?

A     Can you define sustain?

Q     Was it your plan to leave the cattle on the ranch at that time whether or not they were abandoned?

A     Whether the cattle were going to be abandoned—

Q     Yes.

A     —or not a large, large portion of the inventory would have to be moved to some other place.

Q     And if you weren't allowed to abandon them did you have a plan for what you were going to do with them?

A     Yes, I did.

Q     What was your plan?

A     My plan would be to basically mirror what I had done the previous year in 2012.  And we had the ability to lease pasture land and also the main component of that would have been using up the CRP program because of the moisture situation.  The government had allowed the grazing of CRP land.  In 2012 we had every animal off the ranch except the bulls and we were utilizing CRP because of the drought.  So that's how we, you know, handled the late summer, early fall of 2012 and that would have been a mirror image of what I would have implemented for 2013.

        Once we would have gotten to October 1st we would have then went into corn stalks.  The corn harvest would have been on by then so we would have utilized corn stalks.  And, you know, those corn stalks are readily available to everybody.  I mean, there's corn stalks everywhere.  And you can rent them all day long.

Doc. 498 at 648-50 (13-40219).  Widdowson confirmed that his prior testimony

regarding the abandonment was that "I said in the best interest of the cattle to

be abandoned, that's what needed to be done." Doc. 512 at 28 (13-40219).

In its order, the Court found that "Widdowson's testimony at the March

2014 hearing corroborated the fact that the ranch could no longer sustain the

amount of cattle there[.]"  Doc. 557 at 6 (13-40219).

Debtor filed this adversary proceeding on October 6, 2014.  On April 17,

2015, Debtor disclosed the opinions of its expert witnesses including

Widdowson and Deutsch.  Doc. 49-3 at 7-9.  According to the disclosure,

Widdowson's opinions include:

A. That if the Cattle had not been abandoned, Sandpoint Cattle Co. would have been able to sustain the herd by selling some cattle in the ordinary course of business and using those funds to move the cattle to a different location.

B. That if the Cattle had not been abandoned, Sandpoint Cattle Co. could have sold the cattle in the manner in which it ordinarily sold cattle and would have received significantly more than the cattle were sold for by the creditor following abandonment.

C. That the increased monies received from an orderly sale of cattle in the ordinary course of business as registered purebred Angus cattle would have more than offset the additional costs necessary to maintain the herd.

D. If the cattle had not been abandoned, the cattle would have been sold from the Sandpoint Ranch obtaining the benefits of value of sale discussed in the opinion of Mr. Steve Harrison.

Doc. 49-3 at 8.  Deutsch's disclosed opinions are similar:

A. That if the cattle had not been abandoned, Sandpoint Cattle Co. would have been able to sustain the herd by selling some cattle in the ordinary course of business.

14

B.    The cattle could have been maintained even if it required moving the cattle to another location.

C.    That if the Cattle had not been abandoned, Sandpoint Cattle Co. could have sold the cattle in the manner in which it ordinarily sold cattle and would have received significantly more than the cattle were sold for by the creditor following abandonment.

D.    That the increased monies received from an orderly sale of the cattle in the ordinary course of business as registered purebred Angus cattle would have more than offset the additional costs necessary to maintain the herd.

Doc. 49-3 at 9.

Debtor supplemented Widdowson's opinions on June 3, 2015.  In the supplemental disclosure, Widdowson states that the "large reduction of cattle inventory through abandonment was not in any way a company strategy to manage the effects of the drought."  Doc. 66-5 at 6.  He further maintains that the "large reduction of cattle inventory through abandonment was not in any way a company strategy to manage the effects of the drought."  Doc. 66-5 at 6. He states that "Sandpoint had already developed a plan, based on ordinary business practice and past experience, to provide for the feed and care of all the cattle after August 2013."  Id.  That plan included the following strategies:

1.    Move the cattle off the ranch during August & September to CRP range land, incurring minimal added operational expense.

2.    Move cattle from CRP to Cornstalks for October 2013 through March of 2014 depending on inventory.

3.    Harvesting and building a large inventory of Sandpoint raised feed stuffs for additional feed.

4.      None of these operational strategies would have had a
negative effect on marketings or sales of cattle.

5.      Plenty of qualified staff in place to execute these plans
effectively.

6.      Continue to market cattle not necessary to maintain the herd
in the ordinary course of business to generate operating funds
necessary to carry out these steps.

Id.

Defendants deposed Widdowson on June 26, 2015.  Widdowson

confirmed that his testimony at the hearing on the motion to abandon was

accurate and that he continues to stand by it.  He agreed that his testimony at

the hearing was that 1) the cattle could not stay on the ranch, 2) Debtor could

not use the CRP land it had previously used, and 3) Debtor did not have

enough corn and silage to feed all of the cattle.  He confirmed that the cattle

could not stay on the ranch and that "the amounts [of corn and silage] that we

had on inventory at that time would not have taken care of the entire inventory."

Doc. 90-2 at 36.

He testified, however, that "I know for a fact I would have been able to

find CRP land."  Id.  He explained that he did not tell the judge he would have

been able to find CRP land because he "wasn't asked that question."  Id.

Specifically, counsel for Defendants asked Widdowson, "Why did you tell the

federal judge, 'We don't have options.  They have released the CRP, but we

are not able to go back to the same places we did last year.'  Why did you give

16

that testimony? What was the purpose of it?"  Id. at 37.  He responded,

"Because the places that were right close were not available, so we were going

to have to get them off the ranch.  And my meaning was that they are going to

have to leave farther than what they did last year.  They are going to have to go

farther away."  Id.

By either deposition or declaration, Compher, Widdowson and Deutsch

testified that Craig informed Debtor that if it abandoned the cattle, Debtor would

be entitled to a credit equal to the appraised value of the cattle on the date they

were abandoned.  Doc. 192 at 13; Doc. 195 at 2; Doc. 196 at 2.  Craig informed

Debtor that once it abandoned the cattle, Debtor would be relieved of the

expenses necessary to maintain and sell the cattle herd.  Doc. 196 at 2; Doc.

195 at 2.  Based on Craig's advice, Debtor made the business decision to go

along with Craig's suggested strategy of abandonment. Doc. 195 at 2-3.

Debtor claims, however, that its conclusion that it was burdensome to continue

to maintain the herd was based on Craig's representation that Debtor would

receive a credit against the debt in the amount of the appraised value of the

cattle.  If Debtor had known that abandonment would result in an approximate

50 percent reduction in the cattle's value, Debtor would have been able to

determine that caring for the cattle to preserve their value was not a burden to

the estate.

## II.    CONCLUSIONS OF LAW

### A.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial responsibility of identifying pleadings, discovery, testimony and other evidence which it believes demonstrate "the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 324. The moving party satisfies this burden by showing "an absence of evidence to support the nonmoving party's case." Id. at 325. When the moving party has met its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citing Fed. R. Civ. P. 56). The Court views the record in the light most favorable to the nonmoving party and must afford that party all reasonable inferences.  Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180 (8th Cir. 2008) (citing Liberty Lobby, Inc., 477 U.S. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

### B.    Legal Malpractice Action

In this adversary proceeding, Debtor alleges that Defendants breached the standard of care for a bankruptcy attorney by advising Debtor to abandon a large portion of its cattle to its secured creditor.  In its Second Amended Complaint, Debtor seeks approximately $5,000,000 in damages, which represents the difference in the value of the abandoned cattle as appraised by Debtor's appraiser in the underlying bankruptcy case and the net proceeds from the cattle sales by Alger after the abandonment.

In a civil action for legal malpractice under Nebraska law, a plaintiff alleging professional negligence on the part of an attorney must prove three elements:  1) the attorney's employment, 2) the attorney's neglect of a reasonable duty, and 3) that the negligence resulted in and was the proximate cause of loss to the client.  <u>Gallner v. Larson</u>, 865 N.W.2d 95, 104 (Neb. 2015) (citation omitted).  A plaintiff must show that he or she would have been successful in the underlying action but for the attorney's negligence.  <u>Id.</u>

To establish that the alleged legal malpractice was the proximate cause of its damages, Debtor intends to offer testimony it could have sustained the abandoned cattle long enough to obtain the appraised value for the cattle through sales in the ordinary course of business.  Defendants argue that this testimony will directly contradict Widdowson's sworn testimony that Debtor could no longer support the cattle.  Defendants claim Debtor should,

therefore, be judicially estopped from arguing that it could have sustained the

abandoned cattle.

### C.   Judicial Estoppel

The purpose of judicial estoppel is "'to protect the integrity of the

judicial process.'"  <u>New Hampshire v. Maine</u>, 532 U.S. 742. 750-51 (2001)

(quoting <u>Edwards v. Aetna Life Ins. Co.</u>, 690 F.2d 595, 598 (6th Cir. 1982)).

"A court invokes judicial estoppel when a party abuses the judicial forum or

process by making a knowing misrepresentation to the court or perpetrating

a fraud on the court."  <u>Stallings v. Hussmann Corp.</u>, 447 F.3d 1041, 1047

(8th Cir. 2006) (citation omitted).

> Judicial estoppel prevents a person who states facts under oath
> during the course of a trial from denying those facts in a second suit,
> even though the parties in the second suit may not be the same as
> those in the first.  Therefore, a party that takes a certain position in a
> legal proceeding, and succeeds in maintaining that position, is
> prohibited from thereafter assuming a contrary position simply
> because his interests have changed, especially if doing so
> prejudices the party who acquiesced in the position formerly taken
> by him.

<u>Id.</u> (internal quotations and citations omitted); <u>see also</u> <u>Life Inv'rs Ins. Co. of

America v. Corrado</u>, 804 F.3d 908, 914 (8th Cir. 2015) ("Judicial estoppel

generally prevents a party from making a claim at one phase of a case or in

an earlier proceeding and then making an inconsistent, incompatible, or

contrary claim during a later phase or proceeding 'according to the

exigencies of the moment.'") (quoting <u>New Hampshire</u>, 532 U.S. 742 (2001)).

"The circumstances under which judicial estoppel may appropriately

be invoked are probably not reducible to any general formulation of principle.

Three factors, while not an exhaustive formula for determining the

applicability of judicial estoppel, aid a court in determining whether to apply

the doctrine." Stallings, 447 F.3d at 1047 (internal quotations and citations

omitted).  The three factors generally considered include:

> (1) whether a party's later position is clearly inconsistent with
> its earlier position; (2) whether the party has succeeded in
> persuading a court to accept that party's earlier position, so
> that judicial acceptance of an inconsistent position in a later
> proceeding would create the perception that either the first or
> the second court was misled; and (3) whether the party
> seeking to assert an inconsistent position would derive an
> unfair advantage or impose an unfair detriment on the
> opposing party if not estopped.

Kaplan v. Comm'r of Internal Revenue, 795 F.3d 808 (8th Cir. 2015) (quoting

Gray v. City of Valley Park, Mo., 567 F.3d 976, 981 (8th Cir. 2009) (citing

New Hampshire, 532 U.S. at 750–51)).

The burden of proving facts to support judicial estoppel is on the party

seeking to invoke the doctrine, and the burden is a difficult one.  Musso v.

Brooklyn Navy Yard Dev. Corp.  (In re Westchester Tank Fabricators, Ltd.),

207 B.R. 391, 400 (Bankr. E.D.N.Y. 1997); see also Nguyen v. Nguyen (In re

Phan), 2015 WL 4183493, at *8 (stating that because judicial estoppel is an

affirmative defense, defendants have the burden of proof on the issue);

Litton Loan Servicing, L.L.P. v. Eads (In re Eads), 417 B.R. 728, 738 (Bankr.

E.D. Tex. 2009) (citing Fed. R. Civ. P. 8(c) for the proposition that the party

asserting judicial estoppel has the burden of establishing it).  "Courts should

only apply the doctrine as an extraordinary remedy when a party's

inconsistent behavior will result in a miscarriage of justice." Stallings, 447

F.3d at 1049 (citation omitted).  "[J]udicial estoppel does not apply when a

debtor's prior position was taken because of a good-faith mistake rather than

as part of a scheme to mislead the court." Id. (internal quotation and citation

omitted).

### 1.    Inconsistent position

Defendants contend that Debtor's new position that it could have

sustained the cattle is clearly inconsistent with its position offered in support

of abandonment.  Specifically, Defendants identify that Debtor took the

position that it could not sustain 2,376 head of cattle because of the drought

conditions and that it was in the best interests of Debtor and the cattle for

Debtor to abandon them.  Now Debtor plans to present inconsistent

testimony that it could have maintained the cattle.

Debtor contends that neither Widdowson nor any of Debtor's other

representatives previously testified that Debtor would have been completely

unable to care for the cattle.  Debtor acknowledges it "presented evidence in

support of its motion to abandon which unequivocally stated that the cattle at

issue could not have remained *on the ranch*." Doc. 194.  Therefore, it

asserts that the testimony Defendants seek to exclude is not "clearly

22

inconsistent" with the evidence Debtor seeks to introduce.

The parties agree that Widdowson testified previously that Debtor could not sustain the herd on the ranch, but they disagree about whether Debtor was unable to sustain the herd in any way in advocating for abandonment.  Viewing the facts in the light most favorable to Debtor in the context of the summary judgment motion, the Court finds that Widdowson's testimony may be interpreted to refer only to whether the cattle could be sustained on the ranch.  Widdowson's testimony advanced the proposition that sustaining the cattle on the ranch was burdensome to the estate—the only issue at the abandonment hearing.  Debtor did not offer evidence about how it would maintain the cattle if compelled to do so because the parties agreed that abandonment was the best course of action.  There was no need for Debtor to produce evidence that it could temporarily sustain the herd by incurring additional expenses, moving the cattle, securing more feed and making other necessary arrangements.  In any event, none of Debtor's representatives testified that Debtor could not sustain the cattle for at least a short time.  Widdowson's prior testimony is not clearly inconsistent with the proposed testimony.  This factor weighs against application of the doctrine of judicial estoppel.

### 2.    Judicial acceptance of inconsistent position

Defendants assert the Court repeatedly accepted Debtor's position that it could not sustain the abandoned cattle.  Debtor disagrees and asserts

that the Court only found that Debtor could not support the cattle on the

ranch—not that Debtor could not have maintained the cattle at all.

Granting Debtor's motion to abandon, the Court found:

> The only evidence I have here concerning whether the cattle
> should or could or can or may stay on the ranch is that they cannot.
> Ranch can't support them.
>
> * * *
>
> I'm not—I accept Mr. Widdowson's testimony that the cattle
> cannot remain on the premises.

Doc. 90-4 at 70.  Significantly, whether Debtor could sustain the cattle—either on

the ranch or otherwise—was not the issue before the Court.  Rather, the issue

was whether the cattle were burdensome to the estate or of inconsequential

value and benefit to the estate.

Granting the motion to compel, the Court stated on the record:

> But I don't think it's appropriate when we have a trial we have
> testimony that I can't feed 2,376 head of cattle, I can't feed them and
> I've got to abandon them, I want them out of here, when you folks
> just decide on your own well we're not going to do that because we'd
> be giving them too much money.  That hasn't been determined.

Doc. 90-5 at 30.

Lastly, in its order on Debtor's objection to Alger's claims, the Court

found that "Widdowson's testimony at the March 2014 hearing corroborated the

fact that the ranch could no longer sustain the amount of cattle there[.]"  Doc.

557 at 6.

Although the Court repeatedly found that the cattle could not stay on

the ranch, it did not expressly find that Debtor could not sustain the cattle in

some manner other than on the ranch.  This factor weighs against

application of the doctrine of judicial estoppel.

### 3.    Unfair advantage or detriment

As already discussed, Defendants argue that allowing the change in

testimony would impose an unfair detriment to them because not only did the

Court rely on the sworn testimony of Widdowson, but Defendants also relied

upon it in advising Debtor.  They assert that because Debtor provided the

reasoning to support abandonment that it should not be allowed to deny

those reasons to meet the exigencies of this litigation.

The Court is not persuaded that Widdowson "changed" his testimony.

Debtor is not denying the specific facts on which the Court relied to conclude

that the cattle abandoned were burdensome—that the ranch could not

sustain the cattle.  Further, the Court's ruling today does not affect

Defendants' ability to claim or offer evidence at trial that they relied on

information provided by Widdowson to advise Debtor.  Accordingly, the Court

finds that allowing Debtor to present evidence regarding the options

available to it but for abandonment does not impose an unfair detriment to

Defendants.  This factor weighs against application of the doctrine of judicial

estoppel.

Defendants did not meet their burden of providing facts sufficient to

impose judicial estoppel.  Because Defendants' motion for summary

judgment is based on this doctrine, it is denied.

## III.    CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is

DENIED.  The case will proceed to trial beginning January 25, 2016.

The Court has considered all other arguments and deems them to be

without merit.

SO ORDERED.

Dated this January 5, 2016.

SHON HASTINGS, JUDGE
U.S. BANKRUPTCY COURT
SITTING BY DESIGNATION