## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| In Re: Sandpoint Cattle Company, LLC, | Bankruptcy No.: 13-40219 |
| Debtor, | Chapter 11 |

| | |
|---|---|
| Sandpoint Cattle Company, LLC, | |
| Plaintiff, | |
| vs. | Adversary No.: 14-04052-SKH |
| Robert Craig, Robert F. Craig P.C. d/b/a Craig/Bednar Law P.C., and Anna Bednar, | |
| Defendants. | |

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

Plaintiff Sandpoint Cattle Company, LLC initiated this adversary proceeding, alleging a legal malpractice claim against its former attorneys, Defendants Robert Craig, Robert F. Craig P.C. d/b/a Craig/Bednar Law P.C. and Anna Bednar.  It also objected to the Final Application for Allowance of Compensation and Reimbursement of Expenses filed by Craig and Craig/Bednar Law in the underlying bankruptcy case.  Doc. 629; Doc. 640.  The Court consolidated the adversary proceeding and contested matter for trial.  For the reasons stated below, the Court finds in favor of Sandpoint and awards damages in the sum of $1,831,827.63.  The Court will enter a separate order ruling on Craig/Bednar Law's fee application.

### II.    PROCEDURAL BACKGROUND

Plaintiff Sandpoint Cattle Company, LLC filed a Complaint in October 2014, alleging Defendants breached the standard of care for attorneys representing corporate

debtors in reorganization proceedings.  Sandpoint amended its Complaint on October
23, 2014, and sought leave to amend it a second time in January 2015.  The Court
granted Sandpoint's Motion to Amend in part and denied it in part.  Doc. 30.[1]  Sandpoint
filed its Second Amended Complaint on March 10, 2015.

In its Second Amended Complaint, Sandpoint alleged that Craig informed
Sandpoint that its debt to a secured creditor would be reduced by the appraised value of
the cattle if Debtor abandoned its cattle to the creditor.  Sandpoint claimed it relied on
Craig's advice and abandoned the cattle.  Sandpoint also alleged that Craig failed to
negotiate agreements ensuring Sandpoint received appropriate debt offset for the
abandoned cattle and that Craig failed to recommend an orderly liquidation to maximize
livestock sale value.  Sandpoint claims Craig and the firm's negligence resulted in
approximately $5,000,000 in damages.  In addition, Sandpoint alleged that Craig and
his firm breached their contract with Sandpoint by failing to seek Court approval of
attorney's fees before billing Sandpoint and accepting payments.  Sandpoint also
asserted Craig failed to comply with ethical requirements governing payments to
attorneys from third parties.  Sandpoint seeks disgorgement of all the fees it paid Craig
and Craig/Bednar Law as a result of this breach of contract and their alleged
professional malpractice.[2]

Craig and Craig/Bednar Law filed an Answer to the Complaint, denying
Sandpoint's negligence allegations and seeking dismissal of the Complaint.  They
affirmatively alleged that the Complaint fails to state a cause of action upon which relief
may be granted, Sandpoint failed to mitigate its damages, Sandpoint lacks standing to

---

[1] Sandpoint sought to amend its First Amended Complaint to add additional
factual allegations it discovered through preliminary discovery.  It also sought leave to
amend "to add additional parties who may be necessary to this action as a result of an
affirmative defense stated by defendant."  Doc. 20.  Defendants resisted the motion.
After a hearing, the Court granted Sandpoint's request to add new claims and
allegations but denied its request to add new parties.  Doc. 30.  Despite the fact that the
Court denied Sandpoint's request to add additional parties to its pleading, it added Anna
M. Bednar to the caption of the Second Amended Complaint.

[2] Craig/Bednar Law represented Sandpoint from January 2013 to June 2014
when Craig filed Motions to Withdraw.  Doc. 369; Doc. 375.

recover fees paid by third parties and Sandpoint's claims are barred by collateral estoppel and/or res judicata.  In addition, Craig and Craig/Bednar Law claimed that Neb. Rev. Stat. § 25-21,185.07 et seq. bars Sandpoint's negligence claims.  Specifically, they affirmatively alleged Sandpoint's contributory and/or comparative negligence, including its failure to follow legal advice, was in an amount equal to or greater than the negligence of Craig and Craig/Bednar Law, if any.  Craig and Craig/Bednar Law filed substantially similar answers to Sandpoint's First and Second Amended Complaints.

Although she was not named in either the Complaint or First Amended Complaint, Anna Bednar filed a separate answer to the First Amended Complaint on February 20, 2015.  Her responses and defenses were included in the joint answer Defendants filed in response to the Second Amended Complaint on March 24, 2015.

Sandpoint filed Plaintiff's Motion for Leave to File Third Amended Complaint and Motion to Allow Intervention on March 31, 2015.  Doc. 36.  Defendants objected. Doc. 38.  After a hearing, the Court denied both motions.

The day before trial, Sandpoint filed a Motion for Leave to File Third Amended Complaint, this time seeking to add Anna Bednar as a named defendant.  It requested no other amendments to its Complaint.  Doc. 624. The Court granted the motion on the last day of trial.  Doc. 693.

Several weeks before Sandpoint initiated this adversary proceeding, it filed an objection to the Final Application for Allowance of Compensation and Reimbursement of Expenses filed by Craig and Craig/Bednar Law.  In its objection, Sandpoint alleged that Craig and the firm violated the standard of care for an attorney representing corporate debtors in reorganization proceedings based on similar facts as those alleged in the adversary proceeding and claimed that they did not provide services that benefitted the estate.  Sandpoint requests that the Court disallow all of the fees requested and order disgorgement of fees previously allowed and paid to Craig/Bednar Law.  Doc. 640 at 5. As noted above, the Court consolidated the objection to the application for compensation and adversary proceeding for trial but, due to the length of this Order, the Court entered a separate order ruling on the fee application.

III.    **FACTS**

A.    **Prebankruptcy Background**

In the late 1990s, John and Laurie Widdowson operated a cattle ranch in south central Nebraska, where they raised an average of 200 to 300 head of commercial livestock.[3]  They began selectively breeding registered Angus cattle in 1998.  The Widdowsons invested in a few registered Angus cattle, sold the calves and expanded the operation from there.  They named their business "Sandpoint Cattle Company."

John Widdowson had a knack for selecting good quality "genetics."  As the Sandpoint Cattle Company operation grew, Widdowson acquired a reputation for breeding and selling quality livestock.  He met Raymond Alger[4] in 1999 or 2000 at a cattle sale.  Widdowson impressed Alger, who began seeking Widdowson's advice on registered Angus cattle purchases.  Sometime between 2000 and 2004, Widdowson began representing Alger at cattle sales.

In 2004, the Widdowsons sold Sandpoint Cattle Company and its assets, including cattle, embryos, semen and equipment to Alger.  Sandpoint did not own land at the time.  Alger hired Widdowson to manage the day-to-day ranch operation.  He also hired Laurie Widdowson, whose role with the business evolved from bookkeeping, preparing the sale catalog and sales to work primarily focused on sales.

Alger purchased land in Lodgepole, Nebraska, in the spring of 2004 and moved the Sandpoint operation to the Lodgepole ranch on May 5, 2004.  Initially, the

_____

[3] John Widdowson is a fifth-generation family farmer and rancher who has been actively involved in ranching most of his life.  He is a member and voting delegate for the American Angus Association.  He is also a member of the Nebraska Angus Association and 21st Century Beef Club and was elected the Vice Chair for the Animal Health Committee for the Nebraska Cattlemen's Association.

[4] Raymond Alger owns or holds an interest in Alger Cattle Company, LLC and Raymar Farms.  He is also a Trustee of the R. and M. Alger Family Trust.  Raymond Alger serves as a manager, managing member or trustee of these entities.  Each of the Alger entities filed at least one claim in the underlying bankruptcy case.  Raymond Alger signed the proofs of claim.  To simplify, the Court will refer to Raymond Alger and these business entities as "Alger."

Lodgepole ranch included approximately 7,300 acres, but Alger acquired more land over time.  In 2008, the Lodgepole ranch comprised over 10,000 acres.[5]

Sandpoint's breeding operations grew after the move to Lodgepole.  The focus of the business was operating a registered Angus seed stock cattle operation; namely, breeding Angus cattle and selling "genetics" to buyers around the world.  Specifically, the ranch produced purebred Angus bulls to sell to commercial ranches to improve herd quality.  It also sold bull semen and fertilized embryos from the purebred cattle.

In 2007, Widdowson met Michael Deutsch, a financial and tax accountant, who invested in a number of businesses, including several in the agricultural industry.  Deutsch became familiar with Angus seed stock operations through his active involvement and investment in Rock River Ranch, LLP, beginning in 2004.  He assisted the manager of the Rock River Ranch operation and performed some accounting and bookkeeping functions.  Deutsch is a member of the American Angus Association and regularly attends and tracks Angus sales.

Based on circumstances unrelated to the success of the cattle operation, Widdowson believed Alger might entertain an offer to buy the Lodgepole ranch, Sandpoint Cattle Company and its assets.  Widdowson learned that Deutsch and other investors may be interested in buying the operation.  In January 2008, Widdowson arranged a meeting between Alger and Deutsch to discuss a potential sale.  Deutsch and other investors, including Clark A. Compher, Jr., George Londos and Kurt Waldvogel, reached an agreement with Alger for the purchase of the ranch, 2,420 head of livestock and other assets.  The parties finalized their agreement in November 2008.  Deutsch and the other investors formed Sandpoint Cattle Company, LLC in 2008.[6]

_____

[5] According to an appraisal secured by Farm Credit Services, Sandpoint's 10,867 acres of land was worth $9,720,000 as of May 24, 2012.  Bankr. Case No. 13-40219, Doc. 48-1.

[6] As of June 2013, the voting members of Sandpoint included Deutsch, Clark Compher, Curt Waldvogel, George Londos, IGW Trust and John Widdowson.  In addition, Raymond Alger held a one-percent interest which terminated upon Chapter 11 plan confirmation, according to the terms of Sandpoint's plan of reorganization.  Doc. 450 at 14.

Widdowson worked with and for Alger until Alger sold the ranch to the new investors.  As the District Court found in its ruling on Sandpoint's objections to Alger's claims, Widdowson represented Alger until August 1, 2008, and Sandpoint after that date.  Widdowson was its sole managing member until sometime after March 2014.  John and Laurie Widdowson were the only members on the Board of Managers at all relevant times.[7]  Doc. 367.

Alger financed part of the purchase price for chattel property through a master carryback loan in the sum of $10,800,000.  Id.  The Widdowsons, as representatives of Sandpoint, signed the promissory note for $10,800,000 and granted a security interest in all the assets of Sandpoint, both real and personal.  Doc. 610.  Pursuant to the agreements, Sandpoint promised to make annual payments of $600,000 from 2008 through 2012 and $800,000 from 2013 through 2016.  Sandpoint failed to make the $600,000 payments in 2009 and 2010, and failed to pay $150,000 on December 31, 2011.  Id.  These defaults prompted Sandpoint to enter forbearance agreements with

---

In addition to holding a membership interest in Sandpoint, Deutsch served as Sandpoint's accountant and advisor from its inception through the date of its bankruptcy petition.  Deutsch has been involved in substantially all of Sandpoint's material financial activities since the LLC was formed.  He negotiated the purchase and loan agreements with Alger and provided accounting services to Sandpoint during all relevant time periods.

Compher is an owner or shareholder of several companies, including Rock River Ranch, LLP which is also a black Angus seed stock operation.  He invested in Sandpoint to improve the genetics of the Rock River herd.  Due to numerous capital contributions, Compher's membership interest in Sandpoint grew to roughly 90 percent by the time of the January 2016 trial.

According to Sandpoint's 2008 and 2009 tax returns, Widdowson owned a 1.98-percent interest in the partnership.  Sandpoint's 2010, 2011 and 2012 tax returns reflect a decrease in that interest to between .03 percent and .04 percent.  Doc. 300-Doc. 302.

[7] At the time of the January 2016 trial, Deutsch testified that Sandpoint had to "let Widdowson go," at some point after the March 2014 trial.  Compher testified that he is paying Widdowson $5,000 per month to serve as a consultant.  The Court received no information about the Widdowsons' status as managing members of Sandpoint after mid-year 2014.

Alger.  In January 2013, Alger served a notice of replevin, even though Sandpoint sent payments in an effort to cure its default.

After receiving the notice of replevin, Sandpoint representatives consulted Attorney Robert Routh, who assisted Sandpoint in its efforts to resolve the debt to Alger.[8]  Alger rejected Sandpoint's efforts, including its compromise offer.  Routh recommended that Sandpoint petition for bankruptcy relief to stop Alger from pursuing state court replevin remedies.  Doc. 610.  Another attorney from Routh's law firm suggested that Sandpoint consult Craig.

Craig graduated from the University of Notre Dame in 1970 with a bachelor's degree in business and earned a law degree from Creighton University in 1973.  After graduating, Craig worked for the Kennedy Holland law firm.  He began working on bankruptcy cases in his first year of practice.  In addition to the clients he served in private practice, Craig worked as a trustee for a number of years.  Since the early 1980s, he has focused his practice on representing debtors in Chapter 11 bankruptcy cases.

Deutsch remembered hearing that Craig was the best bankruptcy lawyer in the area.  On or about January 29, 2013, Sandpoint retained Defendants to represent it and to file a bankruptcy petition on its behalf.[9]  Id.

### B.   Sandpoint's Decision to Petition for Bankruptcy Relief

Sandpoint petitioned for bankruptcy relief on February 6, 2013.  Deutsch and Compher testified that Sandpoint petitioned for bankruptcy relief to "get a determination" of its debt to Alger.  Deutsch maintained that debt determination was the primary reason Sandpoint petitioned for bankruptcy relief and claimed that Craig understood this.  Both

---

[8] Sandpoint offered Alger $5,800,000 in full satisfaction of its debt to Alger. Sandpoint proposed to pay $500,000 by February 16, 2013, and the balance by November 1, 2013.  Doc. 668.

[9] Compher paid Craig's $25,000 retainer.  He also paid trade creditors in full before Sandpoint filed its bankruptcy petition.

Compher and Deutsch acknowledged that the replevin prompted the decision as well. The Widdowsons testified that Sandpoint filed for bankruptcy relief to stop the replevin.

Other evidence suggests that Sandpoint's poor financial condition played a role in the decision to petition. Sandpoint reported losses in its 2008 to 2012 tax returns. If depreciation is not considered, Sandpoint realized losses in three of the five years. Sandpoint's tax returns also reflect significant capital contributions in each of the five years, suggesting cash flow problems:

| Year | Business Loss | Depreciation | Depreciation Removed | Capital Contribution |
|------|---------------|--------------|----------------------|----------------------|
| 2008 | -$5,562,157 | $6,024,593 | $462,436 | $ 611,000 |
| 2009 | -$3,025,029 | $2,964,837 | -$ 60,192 | $ 200,000 |
| 2010 | -$2,727,507 | $1,924,544 | -$802,963 | $1,349,967 |
| 2011 | -$ 828,140 | $1,290,975 | $462,835 | $ 894,000 |
| 2012 | -$1,719,436 | $1,019,360 | -$700,076 | $ 846,948 |
| Total | -$13,862,268 | | | |

Doc. 298-Doc. 302.

Consistent with his deposition testimony, Deutsch testified at the January 2016 trial that Sandpoint did not have sufficient cash flow from operations in 2008 to 2012 to service debt obligations. Sandpoint defaulted on its payments to Alger, forcing it to enter forbearance agreements with Alger. It also appears that Sandpoint was delinquent on its debt to Farm Credit Services, which demanded that Sandpoint catch up on "deficiencies." Doc. 487.

According to Brad Larson, a certified public accountant called as an expert witness to analyze Sandpoint's financial condition, Sandpoint had a $7 million to $8 million deficit in its capital account in 2010 that grew to a $10 million deficit by the end of 2012. He opined that the deficit was primarily generated by operating losses.

### C.   Postpetition Events

After the Sandpoint principals decided to petition for bankruptcy relief, Craig coordinated with Widdowson, who provided all the information necessary for the schedules. Widdowson explained that his role in the bankruptcy was to act as a liaison

8

between Sandpoint's investors and Craig.  Craig agreed that Widdowson was his primary contact for operational issues.  Craig also spoke with Deutsch, but his "most frequent contact" was with Compher.

Alger filed claims in the bankruptcy case totaling nearly $19 million.  Doc. 610. Sandpoint representatives believed its debt to Alger totaled closer to $6.5 million. Sandpoint filed objections to Alger's claims.  After an aggressively contested hearing, the Court overruled some objections, sustained others and determined that Alger's claims totaled $9,073,662.77.  Id.  Alger's allowed secured claim related to the carryback note totaled $7,081,251.62 plus interest.

### 1.    Cash Collateral Motions

Beginning in mid-February 2013, Sandpoint filed a series of motions seeking the use of cash collateral.  Alger, who held a security interest in all of Sandpoint's property, objected to all of them.  Craig testified that he spoke to Alger's lawyers on multiple occasions, attempting to secure an agreement or consent to these motions and other matters.  Alger refused to consent to anything, resulting in increased litigation costs.

Craig also recalled that the need for cash and the impact of using cash collateral was the primary focus of Sandpoint representatives and counsel at the beginning of the case.  Although Compher provided cash on one or two occasions during the cash collateral disputes, Craig did not recall any of the principals volunteering funds for operating expenses so that cash collateral motions could be avoided.

Sandpoint filed its first motion for use of cash collateral on February 12, 2013.  It supplemented it on February 20, 2013, just before the preliminary hearing where the Court granted interim relief.  However, the Court denied the motion a few days after the final hearing on February 27, 2013.

Following the Court's denial of Sandpoint's first motion for use of cash collateral, Alger suggested Sandpoint stipulate to relief from stay because it appeared Sandpoint had no other source of operating income.  Sandpoint, through correspondence from Craig, declined the request and advised Alger that the equity owners agreed to provide operating funds.  Doc. 293.

Prompted by the denial of the cash collateral motion, Bednar researched whether an equity cushion is sufficient to serve as adequate protection.  In an email she sent March 4, 2013, Bednar informed Sandpoint representatives about an earlier decision written by Judge Mahoney (the presiding bankruptcy judge at the time), in which the Court opined about whether equity served as adequate protection in the context of a creditor's request for relief from the automatic stay.  The Court considered the fair market value of the debtor's assets in deciding whether the debtor offered adequate protection.  In her email, Bednar explained that the decision was regarding "the method to be used in the valuation of collateral" and stated:  "Unfortunately, the legal standard is fair market value."  Doc. 312.

Sandpoint filed its second motion for use of cash collateral on March 11, 2013.  In this motion, Sandpoint offered two livestock inventory lists, each assigning a different dollar value to the cattle and embryos:  one with a stated value and the other with an estimated fair market value.  At the hearings on the first motion for use of cash collateral, Sandpoint offered only stated values in support of its motion.  Sandpoint represented that the "stated value" of Sandpoint's herd, including live cattle and embryos as of January 31, 2013, totaled $5,229,200 ($4,740,075 for 2,760 cattle only).[10]  By the end of July 2013, the stated value of Sandpoint's full inventory totaled $5,431,550 ($4,977,250 for 2,917 cattle only).  Doc. 506.  Sandpoint based its stated values on Borrowing Base Certificates (BBCs) that Widdowson developed while managing the ranch for Alger.  According to Sandpoint's motion, "[b]ecause the actual market value of the herd fluctuated, the BBCs identified the actual number of each category of animal and used a 'stated value' for each category."  Doc. 462 at 7.  Widdowson maintained that he used the BBC figures to track inventory, but the dollar figures do not reflect market value.  In its motion, which was "confirmed" by Widdowson, Sandpoint represented that the market value of its full inventory was much higher:  $6,637,450 as of January 31, 2013 ($6,149,000 for 2,760 cattle).  It explained:  "At any

_____

[10] Sandpoint's schedules filed February 20, 2013, show that it valued its cattle at $5,229,200.  Doc. 522.  Widdowson confirmed that this figure was the Borrowing Base Certificate total and admitted that he provided this number to Craig.  Widdowson denied that this figure equaled market value.

point in time, across the board, the stated values are estimated to be approximately seventy-nine percent (79%) of the fair market value."[11]  Doc. 462 at 7.

The Court held a preliminary hearing on the second motion for use of cash collateral on March 18, 2013.  In its ruling, the Court noted that Alger raised significant credibility issues concerning the increase in the value of collateral and expenses presented in Sandpoint's materials.  It also noted that Sandpoint secured $70,000 in additional capital contributions, on which it could rely pending final hearing.  Consequently, it deferred ruling on Sandpoint's motion until the final hearing scheduled for March 26, 2013.

At the March 26, 2013 hearing, Widdowson explained the difference between the stated values and the estimated fair market values included in the documents offered as evidence.  He testified that the stated values represented the minimum value Sandpoint expected to receive at a quick liquidation sale.  Doc. 471 at 84.  He also explained that the fair market values listed in the motion were his best estimates.[12]  When asked about the information on which he based these estimates, he testified:

> Well, that number would be, to the best of my ability, with all of the experience running this ranch for eight years at Lodgepole, being responsible for the sales, basically all the tools and the data that we've had in our history and yeah, that's how I come up with it, with my ability and with my, you know, knowledge of the operation.

Id. at 85.[13]

To corroborate Sandpoint's market value estimates at the March 26, 2013 hearing, Sandpoint called an expert witness in Angus seed stock operations, Thomas

---

[11] At the January 2016 trial, Widdowson did not affirm the statement that the BBCs represent 79 percent of fair market value.  He claimed market value is higher now.

[12] Deutsch testified that "Sandpoint estimated value of cattle all the time via John" and "Mr. Widdowson's estimates were always very reasonable."

[13] At trial, Widdowson and Deutsch maintained that the stated value did not represent fair market value.

Burke.[14]  In preparation for his testimony, Burke visited Sandpoint's ranch at Lodgepole on March 22, 2013, for the purpose of valuing its herd.  He viewed approximately 770 bulls and over 2,000 female cows.  He also valued the embryos and pregnant recips[15] owned by Sandpoint.  Id. at 22.  He concluded that the value of the complete inventory was $7,019,750 ($6,555,400 for the 2,896 cattle).[16]  Doc. 550.  During the same hearing, Burke testified that Sandpoint's estimate of the market value of its herd— $6,637,450—was "relatively close."  Doc. 471 at 25.  Based on this evidence and other information received at the hearing, the Court granted the second motion for use of cash collateral.

In April and May 2013, Craig communicated with Sandpoint representatives about its bankruptcy exit strategy and a plan of reorganization.  Craig testified that he asked the Widdowsons for one year of cash flow projections showing ongoing operations and profitability.  The information they provided showed that Sandpoint expected the operating losses to continue.  Craig explained that it was difficult to formulate a profitable business model that he could use to prepare a plan that the Court would confirm.  In Craig's view, Sandpoint's business model at the time would "in no way support the confirmation of a plan."

---

[14] Burke was President of the American Angus Hall of Fame, a livestock marketing organization that specializes in managing registered Angus cattle sales. Burke worked with this organization for 50 years.  Doc. 471.

[15] Burke defined recip:  "A recip would be a commercial female. That means she's nonregistered. And a recip would be a female that you place an embryo from a superior Angus seedstock female and put that embryo into that recip to further intensify the progeny numbers of that superior female. And another word for it would be embryo transplant."  Doc. 471 at 23.

[16] Burke's value analysis included Sandpoint's reputation in the Angus seed stock business.  He testified:  "I'd say from the standpoint of [Widdowson's] management practices it's always been very superior. . . . And I was impressed with the—as I always have been—with the care and management of the cattle at Sandpoint." Doc. 471 at 14, 18.  Similarly, Eddie Sims, another expert in registered and commercial cattle marketing, rated Sandpoint as one of the 25 top breeders in the United States and Canada.  Doc. 675 at 74.

According to Craig, drought was one of Sandpoint's primary concerns and planning around it was one of the main components of Sandpoint's plan of reorganization.[17]  Craig understood that Sandpoint was running out of feed, the cattle overpopulated the ranch and Widdowson was concerned that the cattle would harm the land.

Craig testified that he discussed various business plan options with Sandpoint principals.  He claimed that they spoke about the availability of CRP land on which the cattle could graze.  According to Craig, Widdowson said he could not obtain access to CRP land sufficient to solve Sandpoint's problems.  Craig also testified that Widdowson suggested Sandpoint "bring in" another rancher from Oklahoma or find an investor who would agree to a sale and lease-back.  Compher rejected both of these ideas.  Craig testified that Sandpoint representatives also spoke about a large cattle sale, but this idea was rejected as well.  Craig recalled Compher complaining that Widdowson suggested reorganization ideas but did not consider costs such as moving cattle or renting land.  Craig believed Sandpoint was running out of money and options.  In his words, Sandpoint was "running on fumes."[18]

_____

[17] Laurie Widdowson explained that the drought plaguing Nebraska at the time created ranch management challenges.  Feed is the primary expense, and Sandpoint could not feed its cattle on the ranch because there was not sufficient grass available.  Feed was more expensive and cattle sale prices were down, creating cash flow problems.

[18] Sandpoint's monthly operating reports include financial statements from April 2013 to April 2014, except for the month of November 2013.  These financial statements show a total loss of $2,413,858 for that period, with an average loss of $219,442 per month.  Sandpoint incurred losses every month from April 2013 to April 2014, except for February 2014.  Its losses for the months when the abandonment was at issue were:

| Date | Profit/Loss |
|------|-------------|
| 04/30/2013 | ($319,881) |
| 05/31/2013 | ($144,400) |
| 06/30/2013 | ($268,466) |
| 07/31/2013 | ($197,534) |
| 08/31/2013 | ($195,221) |

Sandpoint's cash flow statements show that, between short-term loans from related entities and capital contributions from members, Sandpoint received $1,142,982

In an email sent on June 17, 2013, Widdowson suggested transferring the cattle Sandpoint intended to sell at its fall sale to Alger because Widdowson would not have time to properly prepare for a fall sale given the status of the Chapter 11 bankruptcy case.[19]  On the same day, Craig advised that he liked the suggestion and would amend the plan accordingly.  Doc. 320.

Widdowson's idea prompted a discussion among Craig, Widdowson, Deutsch and Compher about returning cattle to Alger.  Deutsch testified that Sandpoint looked at a number of options for caring for the cattle, but all of these options were more expensive than returning the cattle.

In discussing how to go about reducing the herd, Craig consulted with Sandpoint representatives about abandonment.  It was Craig's idea to pursue abandonment as a method for the transfer. [20]

Craig testified that the driving force for transferring cattle to Alger was Widdowson's concern that the overpopulation of animals was destroying the land.  He maintained that Widdowson's concerns about harm to the ranch served as the basis for calculating the number of cattle to transfer to Alger.  According to Craig, Widdowson

---

in additional capital from August 2013 to April 2014.  This sum is in addition to Compher's payments to trade creditors before bankruptcy, the $25,000 retainer he paid Craig/Bednar Law, and the $70,000 contribution he made for operating expenses in February or March 2013.

[19] Craig maintained that the status of the case did not prevent the fall sale.  He explained that Sandpoint sold some of its bulls in the spring 2013 sale.  Sandpoint participated in this sale without Court permission because it was conducted in the ordinary course of its business.  He maintained that Sandpoint could have participated in the fall sale without Court permission as well because it also would have been in the ordinary course of its business.  Widdowson claimed he did not have time to prepare for a fall sale.  Craig testified that there was nothing about the plan or the progress toward confirmation that would have impacted the timing of the sale and that Widdowson incorrectly assumed the timing of the sale may conflict with the plan confirmation process.

[20] Deutsch testified that he had not heard the word "abandonment," until he received a copy of the motion.  Deutsch stated that Craig referred to the issue as "returning the cattle to Alger," and suggested that this would be accomplished in the reorganization plan.

calculated the number to abandon based on the number the ranch could support, not the number necessary to pay Alger in full.[21]  Both Craig and Bednar maintained that Widdowson said it would be best to reduce the herd to 500 cattle to protect the land.[22]

According to Widdowson, Compher and Deutsch, the primary purpose of returning cattle to Alger was to pay Sandpoint's debt in full.  Deutsch testified that Alger "finally wore all of us down to the point that we were willing to give up the most valuable asset this ranch had" to pay Alger in full.  They claimed Craig assured them on numerous occasions that Sandpoint's debt to Alger would be offset by the appraised value or fair market value of the cattle abandoned.[23]  Deutsch maintained that Craig also assured them that the value would be determined at the time the cattle left the ranch.  Based on these assumptions, Widdowson, Deutsch and Compher decided to abandon enough cattle to pay the carryback note in full.  Widdowson determined the number of cattle to abandon.

Craig advised Sandpoint to err on the overpayment side rather than underpayment, explaining that "[a]s we understand it, Sandpoint will owe Alger on other obligations and any excess value in the transferred cattle can ultimately be applied to those obligations."  Doc. 357.

Sandpoint filed a third motion for use of cash collateral in early June 2013, seeking use of cash collateral through August 31, 2013.  In the motion, Sandpoint represented that preparing accurate projections was difficult for the Widdowsons and Sandpoint's accountant because of the drought and the need to adjust the herd size to improve operational results.  Doc. 451.

---

[21] In support of this proposition, Craig cited an August 3, 2013 email from Widdowson, in which Widdowson referred to a shift in thinking from returning a certain number of head to a returning a certain dollar amount of cattle.  Doc. 499.

[22] Widdowson denied making this statement to Craig or Bednar.

[23] Craig denied these claims.  He explained that a goal of the abandonment was to get credit against the carryback note, and he anticipated a large credit, but had no idea how much the offset would be or what the appraiser would determine the cattle were worth at the time he filed the motion.

At the hearing on this motion on June 26, 2013, Widdowson confirmed that the drought impacted operations. Doc. 473 at 13, 19-20, 43. In the context of explaining his efforts to "manage around" the drought, Widdowson advised that Sandpoint was contemplating a meaningful reduction in the size of Debtor's herd within the next 60 days. Id. at 20. He maintained that a significant reduction in inventory would "reduce the expenditure side considerably" and "without question" benefit Sandpoint. Id. at 21.

During argument on the motion, Craig represented:

> We're going to give Mr. Alger a bunch of his cattle back. And to that end, we have asked counsel when—when his expert can come out and actually inventory, and test, and otherwise value the cattle that we're going to give back so that we could have an agreed number on that. What that does, and what that will do, is in fact, reduce the operating cost by a meaningful amount.

Id. at 54.

According to Alger's counsel, the hearing was the first time Alger heard about Sandpoint's plan to reduce the size of its herd by transferring cattle to Alger. Id. at 57. Alger's counsel also clarified that Alger's request to view the herd was not made in the context of any proposal to reduce the size of Sandpoint's herd.[24] Id. at 58.

At this hearing, the Court heard Alger's complaints about the delay in receiving payments and the use of his cash collateral. In response to these arguments, the Court asked: "Mr. Craig, when is this business going to make some money?" Id. at 54. Despite this concern, it granted the third motion for use of cash collateral.

### a.    Abandonment

Two days after the hearing on the third motion for use of cash collateral, Sandpoint filed a motion seeking authorization to abandon approximately 2,453 cattle to

---

[24] In connection with the motions for use of cash collateral, Alger sought permission in mid-June 2013 for his appraiser to access the cattle and records relating to them. Docs. 294; 330. Craig advised Alger's counsel that Sandpoint would charge $1,000 per day for Widdowson's time to guide the appraiser. Doc. 294. Alger did not go forward with the appraisal. From this point on, Craig understood that Alger was not going to obtain an appraisal.

Alger. It amended this motion on July 10, 2013, seeking to abandon 2,376 cattle to
Alger or, in the alternative, to abandon the cattle to no one in particular.[25]  Doc. 289.  If
the Court granted Sandpoint's request to abandon to no one in particular, Sandpoint
sought relief from stay to allow Alger and other creditors to pursue their contractual
rights to the abandoned animals through replevin or other state court proceedings.  Id.
Sandpoint proposed to deliver the cattle in two tranches: the first tranche would be
delivered on August 1, 2013 and the second tranche would be delivered prior to
October 2013.

In its amended motion, Sandpoint represented that the cattle it intended to
abandon were of "inconsequential value to the bankruptcy estate because it is 100%
encumbered" by Alger and that "the expense that the bankruptcy estate would incur
maintaining and selling the cattle is, and would continue to be, burdensome."[26]  Id.

Sandpoint arranged for a professional appraiser with experience in the Angus
seed stock business to evaluate and appraise the cattle Sandpoint proposed to

---

[25] On cross examination, Craig conceded that, under section 554, most of the
time, property is abandoned to the debtor subject to the creditor's security interest.

[26] Defendants argue that the Court should invoke the doctrines of collateral and
judicial estoppel to exclude evidence that Sandpoint could have sustained the herd
because Sandpoint asserted in the abandonment proceedings that the cattle were
burdensome and of inconsequential value.  The Court is not convinced that the issues
regarding abandonment are identical to the issues in this legal malpractice case or that
Sandpoint's position that it could have sustained the herd is "clearly inconsistent" with
its earlier position that the cattle were burdensome and of inconsequential value.  See
New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (judicial estoppel); Wooten v.
Donovan (In re Donovan), 255 B.R. 224, 227 (Bankr. D. Neb. 2000) (citing Kelly v.
Armstrong, 141 F.3d 799, 801 (8th Cir. 1998)) (collateral estoppel); see also Doc. 284
(Order Denying Motion for Summary Judgment).  Further, Sandpoint's decision to
pursue abandonment was based on the advice of Craig and on Craig's erroneous
representations about the consequences of abandonment.  See Mungo v. Taylor, 355
F.3d 969, 982 (7th Cir. 2004) (quoting the bankruptcy court's conclusion that "it would
hardly be appropriate for the attorney who gave that bad advice to say that because her
client testified in accordance with that bad advice that her client is estopped from
asserting that the advice [is] bad.") (citation omitted).  Consequently, the Court declines
to estop Sandpoint from offering evidence that it could have sustained the herd, despite
its representations in the motion (prepared by its attorney) that the cattle were
burdensome and of inconsequential value to the estate.

abandon.  Craig testified that the appraisal allowed Sandpoint to be in a position to give the Court a genuine basis for determining the fair market value of the cattle abandoned as of the day they were loaded on the trucks.

Eddie C. Sims[27] inspected the first 1,323 cattle shipped to Alger on July 8, 9 and 10, 2013, and opined that they were worth $5,348,000.  Bankr. Case No. 13-40219, Doc. 392.  He inspected the second group totaling 793 head on August 5 and 6, 2013, and concluded they were worth $1,722,050.  Bankr. Case No. 13-40219, Doc. 393. Sims completed a third appraisal on August 6, 2013.  He concluded that the 261 head of cattle inspected on this occasion were worth $919,900.  Bankr. Case No. 13-40219, Doc. 394.  According to Sims, the total value of the 2,377 head abandoned was $7,989,950.  Bankr. Case No. 13-40219, Docs. 392, 393, 394.[28]

---

[27] Sims graduated from Oklahoma State University with a degree in animal science and meat science in 1964.  He began working in the business of merchandising purebred and commercial cattle in 1968 and has been working in this business since. He is self-employed.  The name of his company is National Cattle Services, Inc. Doc. 675 at 66-67.

[28] Sims looked at every "beast" Sandpoint abandoned, but grouped them for valuation purposes.  At the March 2014 trial, Sims testified: "And the way I arrived at the appraisal was current market prices of purebred cattle, what the average overall for the year had been in the Angus breed, what our current sales had been, and just everyday marketing. . . . I appraised the cattle based upon what I was seeing that day when I was there and the market."  Doc. 675 at 69, 90.  Sims recommended that registered cattle sales take place at the ranch location rather than at an auction because, in his experience, cattle sell for more money at the ranch location.  Id. at 89-90.  He also opined that it would have been better for Sandpoint to sell the cattle under its name than to allow Alger to sell them under the Raymar Farm's name.  Id. at 96.

The District Court, which heard Sims' testimony and judged his credibility, discounted Sims' appraisal because it was virtually impossible for Alger to sell the cattle using standard marketing practices under the circumstances of the abandonment.  Also, the District Court found that "Sims's estimate is based on additional optimal conditions that, either by stipulation of the parties or impossibility, did not occur, including:  selling the cattle at the most desirable time of year; selling the cattle off in small numbers so as not to flood the market; selling the purebred Angus cattle at the Sandpoint ranch; and selling the cattle under the Sandpoint name."  The District Court concluded that the assumptions on which the Sims appraisal was based were inflated and the factors listed above rendered the appraisal unreliable to prove that Alger's sales were not conducted in a commercially reasonable manner.  Doc. 458 at 10 n.7.

Alger consented to the abandonment but requested limited modifications to the cattle transfer process. Doc. 339. Specifically, Alger requested that the 2,376 head of cattle remain in their current location until auction. He suggested a public sale in 90 to 120 days at the Lodgepole ranch.

By email correspondence, Sandpoint advised Alger that it would not permit the cattle to stay on the ranch after the abandonment and would not allow Alger to market them from Sandpoint or market them in Sandpoint's name. Doc. 340. Sandpoint maintained this position at the hearing on its motion and in correspondence after the hearing. Doc. 354. At the January 2016 trial, Widdowson and Deutsch testified that Sandpoint's relationship with Alger had soured and they were concerned Alger would shift blame to Sandpoint if something happened to the cattle on the ranch after the abandonment.[29] They also expressed concern about damage to the ranch if the cattle remained there. Deutsch testified that he asked Craig whether it was necessary to allow Alger on the ranch if Sandpoint returned the cattle. Craig reportedly answered "no." Deutsch also testified that, if Sandpoint allowed Alger to use its name for selling the cattle, it would appear to buyers that Sandpoint was conducting a dispersal sale, which Deutsch claimed would be devastating to Sandpoint.[30]

The Court held a hearing on Sandpoint's motion to abandon on July 24, 2013. Consistent with his written response to the motion to abandon, Alger maintained that if Sandpoint abandoned the cattle "generally" then Alger could take possession under the Uniform Commercial Code (UCC) and sell the cattle without the need to pursue a replevin action. Doc. 474 at 7-8. Alger requested relief from stay to do so. Alger

---

[29] In its closing argument, Sandpoint also argues that there is "nothing but speculation to support the allegations that selling the cattle from the Sandpoint ranch would have brought more money." Doc. 689 at 26.

[30] Each of the registered Angus cattle born at the Sandpoint ranch was given a name that included "Sandpoint" in it. See Doc. 555. Consequently, buyers understood they were buying Sandpoint genetics when they purchased cattle with "Sandpoint" in the registered name, regardless of who bought or sold the animal. Deutsch and Widdowson were not concerned about Alger selling Sandpoint cattle—unless he made it appear as though Sandpoint was sponsoring a large dispersal sale, which may raise suspicion among buyers that Sandpoint was going out of business.

explained that he planned to liquidate the abandoned cattle and apply the proceeds to Sandpoint's debt.  He acknowledged that he had to sell the cattle in a commercially reasonable manner and had already contacted a sale organizer and auctioneer for that purpose.  Id. at 8.

Widdowson testified at the hearing in support of the motion to abandon:

> In my opinion, a large portion of the reason for the abandonment of the cattle is no matter who has possession of the cattle, whether it be the debtor or the creditor in this situation, they have to leave. This ranch has been now through almost 18 months of drought. The drought has only gotten worse, and I have no foreseeable end to it yet.  Your Honor, you know law, but I could take anybody in this courtroom with me, drive through that ranch, and anybody here could see what I'm talking about.  There is not grass.  It's not there.
>
> And, you know, we've stretched the asset of the land resource, Your Honor, as far as we possibly can.  It hasn't rained significantly enough for the last 18 months.
>
> We've used up every bit of extra resource[31] that we've had to maintain the collateral to the best of our ability and also protect the collateral and the asset of the land.  But we're at that point in time where some drastic changes need to be made.  We cannot hold it together with the current beating situation that we're in.  So again, as I say, no matter who has possession of the cattle, they need to go to a different location, probably— you know, properly take care of them and feeding them in a way that we all want in the best interest of the cattle.

Id. at 15-16.

In response to a question about where he planned to house the abandoned cattle if they stay on the ranch, he testified:

> We've been under the thought process and the business model that the last week of July or somewhere in there, we would be—these cattle would be leaving the ranch in allowance of us to get ready for those other cattle that we are going to wean and put in those pens.  We typically don't have cattle in those pens.  And so for lack of a better analogy, the hotel's full and we've got to bring in next weekend's occupants and we've got to kick the other

---

[31] At the January 2016 trial, Widdowson testified that "extra resource" meant extra grass on the ranch; Widdowson claimed he was not talking about cornstalks, CRP land, etc.

ones out.  I mean, it's not just one day, open the gate and move them out
and move the other ones in.  We need time to prepare those pens.  We
need to do some repairs, get them in the best shape we can, and that's a
process.  And, you know, operationally, you know, we've kind of had this
scheduled for the last three days that this is what was going to happen with
the abandonment, and we've got the next two or three, four weeks already
scheduled with the thought process of those cattle leaving, preparing to get
the next draft of cattle that we will return to Mr. Alger, plus being able to
maintain the collateral that we're going to keep and doing it in the right
process.  So for lack of, again, another term, we're going to have a major
logjam in the next two weeks with inventory if something is not done.

Id. at 17-18.  Widdowson also explained:

You know, we're just running out of margin, your Honor.  I mean, we—last
year was a drought, but we had a great year before, so we had some
reserves.  We had some carryover grass.  We had some options.  We had
flexibility.  We've exhausted all those reserves.  I mean, we didn't have near
the—for example, we are running about 50-percent less cows out in the
pasture out grazing than we did last year.  We haven't reduced the numbers
at all.  Based upon the purchase agreement and the requirements that I
have to maintain the collateral, I still have to keep the cattle, but we are not
able to use the asset of the land to take care of them just because the land
ain't got the grass to do it.

So our pens and our facilities are maxed out due to the drought.  And
now, when we take those calves that we need to wean 1st of September,
we really don't have the facilities to go with them unless we move those
cattle out.

Id. at 30-31.  When asked what he planned to do with the cattle, he answered:

I wish I could sit here and say these are all choices that I've made.  No, I'm
reacting to what we've been dealt with and we're trying to manage and
reduce the amount of the risk and the negative effects.  So, you know, one
thing that I'm really struggling with is forecasting the feed resources that
we're going to need going forward.  You know, if we need to maintain this
collateral for another 90 to 120 days, we've never had to feed this many
cattle ever.  The consumption of feed that we will use will be enormous, and
it will only compound what will happen after the first of the year.  You know,
we're going to use up so much of our resources that the ranch can provide
that the effect of having to go out on the open market and buying
commodities to feed these cattle would even be more time.  It'll be a longer
deal.

So that's what I'm really concerned about is we just don't have no
reserves.  We've used up all the extra that we had, and at some point in

time, Your Honor, we're stewards of the land.  And at some point in time, we have to protect the land, and we're at that point now.  There are spots where it's just—there's nothing there, and we will do some damage to this land if we keep doing this.  It could take years to rebuild.  Might not just take three months, it could take years.

And that's why I think something needs to happen now is because we were hopeful that in April and May that this thing would turn around.  I don't see an end to the drought yet, and once that end comes, we're going to need some time just for adequate or even above-adequate moisture just to let it catch its breath and go.

So again, I wish it was just me saying these cattle have got to leave, but they've got to based upon the ranch.  I mean, the ranch is the driving force here.

Id. at 31-32.  Widdowson reiterated that there were no reserves left on the ranch.  Id. at 43.  He claimed: "we made management decisions last year to get the cattle off the ranch so that we did not cause any harm to the ranch."  Id. at 43.  To feed the herd, Sandpoint subrented CRP land and leased property close to the ranch.[32]  Id. at 43.  According to Widdowson, some of the costs associated with land leases were attributable to the drought.  Doc. 326.  In May 2013, Widdowson assumed that Sandpoint could maintain the herd but, by July 2013, he knew that Sandpoint could not support the total number of cattle Sandpoint owned.  Doc. 474 at 45.  He testified:

We've looked at other things, as far as the CRP and all that kind of stuff, whether that was going to be released again, and yes, it's been released again.  So as I went there and talked to see if that was going to be an option again, they're not going to allow us to go back to the same fields that we grazed the previous year.  So that option, as far as mitigating some of the drought, basically was evaporating on us.

Id. at 45-46.  At the January 2016 trial, Widdowson affirmed his testimony that the CRP land he used in 2012 was not available but claimed he could have found new or

---

[32] In early June 2013, Widdowson was still negotiating land leases.  Doc. 326.  Based on information Widdowson provided for the petition, Sandpoint assumed several prepetition leases and he planned to pursue other leases.  Doc. 324; Doc. 473 at 31.  The leases resulted in savings for Sandpoint.  Widdowson wrote in an email:  "Our current cost was $2.68/hd/day for feed not including labor, fuel, yardage.  So lets [sic.] use a conservative $3.00/day."  Doc. 326.  The lessor charged only $26,892 for 249 head for 80 days, which equates to $1.35 per head per day.

different CRP land.  Widdowson also testified that Craig told him to accentuate the drought and the effects on the ranch at the abandonment hearing.[33]  According to Widdowson, Craig insisted that the concern was to defend Sandpoint's decision to get the cattle off the ranch.

On July 25, 2013, the Court granted Sandpoint's amended motion to abandon 2,376 head of cattle to Alger.  It also granted relief from the automatic stay to allow Alger to take possession of the cattle and remove them from Sandpoint's property.  Doc. 290.  The Court ordered Alger to remove the first group of animals by August 3, 2013, and the second group of animals by August 13, 2013.  Id.

On the day the Court granted Sandpoint's motion to abandon, Widdowson provided information to Alger regarding the first tranche of cattle that it planned to ship to Alger.  Initially Widdowson assumed that the abandoned cattle would be shipped to California.  Doc. 337.  By July 25, however, Widdowson understood that the cattle may stay in Nebraska.  Doc. 490.  Widdowson also advised Alger's representatives that some of the cattle in the first tranche were located on land owned by third parties and would be transported to Alger from various locations.  Doc. 346.

On August 1, 2013, Alger again advised Sandpoint that he intended to sell the cattle, maintaining again that there was no need to secure an appraisal because the sale price would determine the value.  Doc. 352.  Craig responded to Alger's comments about the necessity of an appraisal as follows:

> We understand that Alger intends an imminent sale of some or all of the cattle and further understand your belief that the sale price will be determinative of their value.  Obviously, Mr. Alger can do as he thinks best with regard to retention/disposition of the cattle.  Respectfully, we do not agree with your assessment of what will determine the value of the cattle being turned over.

Id.  Deutsch was "shocked" to learn that Alger was not planning to secure an appraisal.  He expressed concern about this to Craig, who he claims assured him that if there was

---

[33] Compher and Widdowson denied that the drought was the reason for the abandonment.  They admitted there were difficulties with the drought, but claimed that Sandpoint did not abandon cattle because of the drought.

only one appraisal, it would be the only evidence considered by the Court in determining market value.  Deutsch reported that he was very relieved by the news.

On August 2, 2013, Craig advised Alger's counsel that Sandpoint anticipated the actual number of cattle it intended to abandon would be fewer than the number included in its motion and the Court's order.  Craig's notice to opposing counsel was prompted by Widdowson's calculations based on the Sims appraisal showing that the carryback loan (that Craig assumed totaled approximately $6.6 million[34]) could be repaid with proceeds from fewer cattle than the number Sandpoint agreed to abandon.  Doc. 357; Doc. 499.  Alger objected to this proposal, claiming that the carryback loan debt totaled over $12 million and asserting that Sandpoint must abandon the number of cattle included in the Court's order.  This exchange prompted Alger to file a motion seeking an order compelling Sandpoint to release 2,367 head of cattle as ordered by the Court.  Doc. 362; Doc. 475.

In opposition to Alger's motion and in support of Sandpoint's argument that it should be permitted to reduce the number of cattle abandoned, Sandpoint offered Widdowson's declaration dated August 11, 2013, in which he testified:

> I acknowledge that, during the July 24, 2013 hearing on Debtor's Motion to abandon, I testified to the effect that Sandpoint was not able to sustain the number of cattle that it had and that drastic changes needed to be made due to a drought that had extended for some eighteen months.  I further testified to the effect that that most reasonable approach would be to abandon the excess cattle, and that whoever had possession of those cattle needed to move them somewhere else.  I hereby reaffirm that testimony.

Doc. 465. Despite this testimony, Widdowson maintained that Sandpoint's capacity to care for its cattle would not be adversely stressed by retaining an additional 261 head.  Id.

---

[34] Craig provided this sum to Widdowson.  Craig started with Sandpoint's calculation of the balance due on the carryback note as of the date of petition ($6,450,667.96) and calculated interest from the petition date to August 31, 2014.  He concluded that the total due on the carryback loan was $6,632,700.51.  Doc. 357.

During oral argument on the motion to compel, Craig expressed concern about Alger selling 500 head of cattle immediately rather than waiting 90 to 120 days, suggesting that such a "fire sale" would not maximize sale proceeds.  Alger maintained that the sale price would determine the value of the cattle, but Craig claimed that value was an issue for the Court to determine.  Doc. 475 at 19.  Alger's counsel objected to the fire sale characterization and acknowledged that he had an obligation under the UCC to use commercially reasonable sale methods.  Id. at 25.

At the end of the hearing, the Court addressed the parties' dispute about the sum of Alger's claim and offset resulting from the value of the abandoned cattle.  The Court[35] stated:

> The claim is 12 million some dollars, you folks don't agree with it, we'll have litigation on that. It's not going to be determined by whether you counted head of cattle going out and put a value on it or he sells 500. We're going to have a hearing and you can both present whatever kind of evidence you think is appropriate with regard to the value as of the date the cattle left this place, not the date that it was going to be sold.

Id. at 28.  The Court then granted the motion to compel, stating on the record:

> But I don't think it's appropriate when we have a trial we have testimony that I can't feed 2,376 head of cattle, I can't feed them and I've got to abandon them, I want them out of here, when you folks just decide on your own well we're not going to do that because we'd be giving them too much money. That hasn't been determined.

Id. at 30.

Based on the pleadings and correspondence between Craig and Widdowson, Deutsch and Compher, Craig understood that the two objectives Sandpoint sought to attain with abandonment were: "i) to pay off the Alger Carry Back Note; and ii) to minimize the number of head you will need to care for after the transfers so that the ranch is not overpopulated and stressed.  It may well be that you will have to place a

---

[35] United States Bankruptcy Judge Timothy Mahoney, presiding.

number of head offsite to facilitate this latter goal." Doc. 357.[36]  Craig relayed these

goals to the Court in oral argument on the motion to compel.  Doc. 475 at 16.

Sandpoint accomplished the first transfer, totaling 1,322 head, on August 3,

2013.  Doc. 357.  It delivered the remaining cattle it abandoned by August 13, 2013.

Doc. 458.  To ensure there were no complaints about the quality or health of the cattle,

Sandpoint arranged for a veterinarian to conduct a health check on each animal.  Four

days after the first delivery, Alger sought Sandpoint's cooperation with the transfer of

registration documents in time for a bull sale on August 14, 2013.  Doc. 297; Doc. 359.

Sandpoint electronically transferred brand registration certificates to Alger pursuant to

this request.[37]  Doc. 360.  In a series of emails between Craig and Alger's counsel,

Craig maintained ownership of the cattle transferred to Alger when Alger accepted

possession of the cattle and the brand registration transfer was complete.  Alger's

counsel disagreed, claiming that Alger was a secured creditor who took possession of

the cattle and disposed of them under the UCC as adopted by Nebraska.  He explained

that the Court did not transfer ownership to Alger and abandonment did not convey

ownership.  Doc. 359.  In response, Craig asserted:  "Ownership has already changed

hands.  Alger's resale is not a simple disposition by a secured creditor."  Id.[38]

---

[36] In the same correspondence to Deutsch, Widdowson and Compher, Craig
recommended that Sandpoint ship the least valuable cattle to minimize the number of
head remaining and the stress on the ranch.  Doc. 357.  Widdowson denied shipping
the least valuable cattle to Alger.  He claims he wanted to keep a cross section of
genetics, so he shipped based on that principle.

[37] Sandpoint executed Brand Inspector Local Inspection Certificates showing
Alger as the buyer and Sandpoint as the seller.  Doc. 465.

[38] Widdowson explained:  "In the cattle industry, and in the ordinary course of
Sandpoint's business, one who is transferring cattle to another in Western Nebraska, for
the purposes Sandpoint transferred cattle to the Alger interests, is required to obtain
and retain formal Brand Inspector's Local Inspection Certificates verifying the transfer at
the time it takes place.  One of the reasons for this requirement is to identify the number
and type of animals being transferred, and to make clear that ownership has been
transferred to the transferee."  Doc. 465 at 1-2.

Alger began selling the Sandpoint cattle in August.  He retained Larry Cotton, who assisted him with marketing.[39]  Doc. 678 at 78.  Through a series of private treaty sales and three auctions, Alger sold the abandoned cattle.  The sale netted a total of $4,677,348.88, most of which was eventually credited toward Sandpoint's debt to Alger. Doc. 458.  Alger maintains that he did all he could to maximize sale price.  Doc. 678 at 79.  Cotton testified by declaration that Alger's sale processes were commercially reasonable and that Alger obtained a "good and reasonable" price for the abandoned animals.  Doc. 551.  He also testified that "actual sale prices in a public auction in a recognized market are, in my opinion, the best indication of fair market value."[40]  Id. at 4.

Widdowson, Deutsch and Compher were disappointed in the sale prices because they believed the Sandpoint cattle were worth more than the sum the buyers paid.[41] They still assumed, however, that Sandpoint would receive an offset equal to appraised value of the cattle on its debt to Alger rather than the sale value.  They claim Craig maintained this would be the case.  Documents Craig prepared, including Sandpoint's Disclosure Statement, First Plan of Reorganization and correspondence to Sandpoint representatives confirm this understanding.[42]  Compher claims the first time he learned

---

[39] Larry Cotton is the founder and President of Cotton & Associates.  Cotton & Associates serves registered and commercial beef cattle breeders, providing marketing and brokerage services and management programs nationwide.  Doc. 551.  He has more than 20 years of experience providing management and marketing services to cattle breeders, including Angus cattle breeders.

[40] Cotton also prepared a herd inventory and appraisal as of September 23, 2013.  He proposed that the market value of 1,145 head Alger intended to sell at an auction on December 9 and 10, 2013, totaled $2,370,850.

[41] In support of this claim, Sandpoint offered the March 11, 2014, testimony of Tom Burke, who opined that Alger did not market and sell Sandpoint's abandoned cattle in the manner necessary to achieve the best price.  Burke had seen the Sandpoint herd in March 2013, but did not view the specific animals sold in August 2013 and did not know which cattle were sold.  Doc. 671.

[42] Sandpoint's First Chapter 11 Plan of Reorganization dated September 16, 2013, provided that the appraised fair market value of the abandoned cattle totaled $7,989,950 and that "the value of the abandoned cattle shall be a credit against the Alger Secured Claim up to the allowed amount of said claim."  Doc. 450 at 9.

that Sandpoint might not receive an offset equal to the appraised value of the abandoned cattle was shortly before the March 2014 trial to determine the value of Alger's claims.  Several weeks before trial, Compher hired separate counsel, Ross Plourde, because he was worried about whether Craig would perform well in the courtroom.

On March 10 to 13, 2014, the District Court held a trial on Sandpoint's objections to Alger's proofs of claim.[43]  After costs of sale and other deductions, Sandpoint received a credit of $3,461,662.77 toward its debt to Alger on the carryback loan.  Doc. 458.  The credit, which represented net proceeds from the sale of the abandoned cattle, became effective August 13, 2013, the date Alger assumed possession of all of the cattle.  Id.

### D.    Bednar's Role in the Bankruptcy Case

Craig hired Bednar as an associate in January 2010.  The firm began using the name "Craig/Bednar Law" in 2013, but Bednar was not promoted to partnership status.  Bednar's role and function in the law firm was to provide support work for Craig and his clients.  She researched the law, sorted documents and organized files.  She acquired no clients of her own; all her work was for Craig and his clients.  Although she communicated directly with some of Craig's clients, she never served as a primary contact for any of them, including Sandpoint, unless Craig was unavailable.

During the January 2016 trial, several witnesses testified that Bednar participated in conversations and telephone conferences with Sandpoint representatives about a number of topics including debt offset and legal research regarding collateral valuation.  Deutsch testified that Bednar did not make any affirmative statements about the issues in this case; she simply did not object to or disagree with Craig's statements.

Bednar testified that she did not participate in negotiations in the Sandpoint case.  She was not present at meetings where abandonment alternatives were discussed with

---

[43] Hon. Michael J. Melloy, Circuit Judge, sitting by designation, due to the retirement of Hon. Timothy J. Mahoney, United States Bankruptcy Judge for the District of Nebraska.

Sandpoint representatives, and she did not recall advising Sandpoint to get an
appraisal.

### E.    Facts Regarding the Alleged Breach of the Standard of Care

Sandpoint claims Defendants breached the standard of care by advising
Compher, Deutsch and Widdowson to abandon the cattle without outlining available
alternatives and explaining the potential risks arising from this decision.  Compher,
Deutsch and Widdowson claim Craig never advised them about the risk that Sandpoint
would receive liquidation value for the cattle abandoned.  Deutsch testified that Craig
did not suggest debtor-in-possession financing or filing a request for a hearing to
establish the value of the cattle prior to turning them over to Alger, or a sale pursuant to
section 363 of the Bankruptcy Code.  Sandpoint also alleges Defendants informed
Sandpoint representatives that its debt to Alger would be reduced by the appraised
value of the cattle if it abandoned its cattle to Alger, and they relied on this advice when
authorizing Craig to pursue this remedy.

Craig testified that, given the timing and severity of the problems Sandpoint
faced, abandonment was the only option.  He maintained that returning cattle through a
confirmed plan would take too long because Alger disputed everything and would object
to any plan proposed.  He also testified that conducting a sale outside the ordinary
course of business under section 363 of the Bankruptcy Code was not a viable option
because such a sale would not help with the overpopulation problem and Alger would
not agree with this option. Craig claims no legal approaches other than abandonment
made sense.

At the January 2016 trial, Craig testified that when he filed the Motion to Abandon
he had no idea what the appraised value of the cattle would be or the amount of the
debt offset Sandpoint would receive after the transfer.  He had no expectation that the
abandoned cattle would pay the debt in full and did not suggest this to the Sandpoint
principals.  The objective of securing an appraisal was to give the Court credible
evidence of the value of the collateral returned to Alger, which he claimed mitigated the
risk that Sandpoint would not be given proper credit for the cattle in the event Alger sold
the cattle for less than they were worth.  He also explained that, if Alger had kept the

cattle rather than selling them, Sandpoint would have offered the appraisal at a valuation hearing to determine the appropriate debt offset.  However, Craig denied that he guaranteed that Sandpoint would receive a debt offset equal to appraised value.

Craig also testified he relied on Judge Mahoney's statement at the end of the hearing on the Motion to Compel to support his belief that the Court would determine the value of the cattle as of the date of the transfer, not the date of sale.[44]  Doc 391; Doc. 505.  He also asserted that Sandpoint should have been given a debt offset equal to appraised value rather than sale value, which is contrary to the Court's June 10, 2014 order.  See Doc. 458.

Both parties called expert witnesses to testify about whether Craig breached the standard of care.  Sandpoint called Phillip Kunkel[45] and David Warfield,[46] both of whom testified that Craig did not meet the standard of care for attorneys representing corporate debtors in reorganization proceedings.  Neither expert commented on whether Anna Bednar breached the standard of care.

Kunkel testified that he had never heard of a case where a debtor abandoned its principle-producing assets without the agreement of a secured creditor regarding the amount of credit the debtor would receive.  By abandoning the cattle, Sandpoint allowed Alger to control the sale.  Warfield opined that the UCC applied after Sandpoint abandoned the collateral.  Kunkel explained that, under the UCC, a creditor's burden of

---

[44] Craig claimed Judge Mahoney's statement should be viewed as law of the case.  The District Court has already rejected Craig and Sandpoint's reliance on this statement as supporting the proposition that the cattle would be valued as of the date of transfer or that the value would be determined by the Sims appraisal rather than sale value.  Doc. 458 at 9-11 n.6.

[45] Phillip Kunkel is an attorney at Gray Plant Mooty in St. Cloud, Minnesota, who specializes in commercial workouts, bankruptcy and agricultural contact law.  He has been involved in more than 200 bankruptcy cases, where he represented both creditors and debtors.  His experience includes farm bankruptcies and trustee work.

[46] David Warfield is a partner at Thompson Coburn in St. Louis, Missouri.  He has exclusively practiced bankruptcy law nearly his entire 30-year career, representing both debtors and creditors.  He has been involved in hundreds of bankruptcy cases over the years.

showing that he sold collateral in a commercially reasonable manner is not difficult, but it is difficult to challenge a sale under this standard.  Warfield testified that it was a violation of the standard of care to advise Sandpoint to abandon cattle, whether the parties fixed the sum of the debt offset or not.

Kunkel and Warfield opined that Craig also violated the standard of care by advising Sandpoint that it would receive a debt offset equal to the full appraised value of the cattle through abandonment, absent Alger's agreement regarding this value.  According to Warfield, Craig also breached the standard of care by failing to advise Sandpoint that abandonment might result in liquidation value.

Both Kunkel and Warfield opined that Craig breached his duty to advise Sandpoint representatives of all the options available to it, including a consensual sale (by either Sandpoint or Alger), a sale under section 363 of the Bankruptcy Code, a phased sale over time, surrendering cattle to Alger for an agreed upon credit and using a plan of reorganization to set the value of the collateral or provide for liquidation of it.

Kunkel also suggested that Craig should have advised Sandpoint representatives to help with the sale after abandonment by assisting with advertising, allowing Alger to sell the cattle from the ranch and marketing the cattle in Sandpoint's name.

Defendants called Henry Buswell Roberts,[47] who testified that Craig did not breach the standard of care for attorneys representing corporate debtors in reorganization proceedings.  Roberts opined that, based on the facts available to Craig at the time, abandonment appeared to be the only available option for Sandpoint.  Sandpoint's contentious relationship with Alger and the urgency of the situation foreclosed most of the options typically available to debtors.  According to Craig's and Widdowson's testimony, Sandpoint needed to remove some cattle from the ranch immediately.  Roberts opined that a valuation hearing, phased sale or proposals regarding liquidating or surrendering cattle through a plan of reorganization would take too long.  Consensual sales, strict foreclosure under the UCC or a prompt 363 sale

---

[47] Roberts has been an attorney for 40 years.  He practices bankruptcy law, representing both debtors and creditors.  He is board certified in business bankruptcy.

required Alger to consent, and Alger objected to everything.  He suggested that it was reasonable for Craig to conclude that these remedies were not available options.

Roberts also testified that an attorney may rely on sophisticated clients.  It was appropriate for Craig to defer to Sandpoint representatives regarding whether to allow a sale on the ranch and whether to allow the use of Sandpoint's name.  Although Roberts would have asked a client if it wanted to make a capital contribution under the circumstances of this case, he testified that it was reasonable for Craig to assume that the principals would not do so given the defaults before bankruptcy.  Roberts conceded that he would not tell a client that it would receive fair market value for abandoned property.

## F.    Facts Regarding Alleged Proximate Cause

Compher, Deutsch and Widdowson all testified that Sandpoint could have and would have maintained the cattle had they known of the risk that Sandpoint would only receive an offset for the "fire sale" price Alger received when he sold the abandoned cattle.  Widdowson testified that if Sandpoint had not abandoned the cattle, the focus of his efforts during the spring and summer of 2013 would have been to prepare for the fall female sale in Chaplain, Nebraska.[48]  Until then, he would have fed some of the cattle at Sandpoint's feedlot facilities.  Before the decision to abandon, Sandpoint transferred some cattle to other locations.  Widdowson explained that he would have left these cattle on the land leased from third parties and searched for more pastureland.  He also planned to search for more CRP land.  Widdowson was confident that he could have found different CRP land to feed the cattle, even though the CRP land he had rented for the past couple of years was not available.  He would have fed the cattle the new crop of silage that was ready in mid-September and cornstalks starting in October.[49]  He

---

[48] As noted earlier, lack of time to prepare for this sale prompted Widdowson's June 17, 2013 email suggesting that Sandpoint transfer some cattle to Alger.

[49] Widdowson testified that cornstalks are inexpensive.  Sandpoint spends 30-35 cents/cow/day for the season on cornstalks.  He claimed that he had access to not less than 2,000 to 5,000 acres of cornstalks starting in October 2013, and could have made arrangements for more.  Deutsch and Widdowson testified that CRP land is also

claims he could have found other feed alternatives until then.  Widdowson repeatedly testified that he carried a good reputation in the community and fostered a network of professional contacts that he could call upon to find feed for the cattle.  Widdowson claims he told Craig about the options available to keep cattle.  Likewise, Deutsch testified that Sandpoint representatives told Craig the cattle could be kept at other locations.

Compher testified that he had resources sufficient to fund the operation while Sandpoint waited for cattle prices to increase, if necessary.[50]  On cross examination, he admitted that he had already transferred over $1 million to Sandpoint by 2014.

In an email sent in June 2013, Craig warned Sandpoint principals that the corporation would need capital infusions to make a plan work even if Sandpoint returned some cattle to Alger.[51]  Doc 329.  Despite Craig's warning, Compher maintained that Craig did not suggest to Compher that he contribute money to Sandpoint to avoid liquidating the herd.  Craig maintained that Compher did not offer additional funds.  Craig testified that "Sandpoint was dying here," and he would expect someone with the level of business sophistication that Compher possessed to recognize the situation and offer to recapitalize if he had the wherewithal to do so.

---

inexpensive.  The cost to pasture cattle on this land for 60 days is $3/per animal or 5 cents/day/animal.

[50] Compher's financial statements shows he had a net worth of between $17-$18 million in 2013 and 2014.  Doc. 556.  He testified that he earns between $2.7 and $2.8 million per year.

[51] In an email sent on June 19, 2013, Craig wrote:  "While I may be wrong, my file suggests that the latest set of projections includes a September sale that is not going to happen.  It also shows a negative cash flow after debt service and appears not to include all debt service.  Our initial draft Plan adjusts debt service and mandates capital infusions."  Doc. 329; see also Doc. 473 at 54.  Consistent with this understanding, Sandpoint's First Chapter 11 Plan of Reorganization dated September 16, 2013, provided that members of Sandpoint would fund additional capital contributions.  Doc. 450.  These contributions were necessary to fund the plan, even though Sandpoint assumed that it would receive full credit for the $7,989,950 appraised value of the abandoned cattle.  Id.

Brad Larson, a certified public accountant who analyzed Sandpoint's financial condition, opined that Sandpoint could not have sustained its full herd profitably.

Similarly, Dr. Patrick E. Reece,[52] an expert witness called by Defendants, questioned Sandpoint's ability to maintain its herd during the summer and fall of 2013 without incurring substantial costs. Reece determined the nutritional needs of the Sandpoint herd (based on the number of cattle included in the July 2013 BBC report) before abandonment and the amount of feed necessary to meet the nutritional needs of the cattle abandoned for a one-year period beginning on July 29, 2013.

He then considered the resources available to Sandpoint to feed its cattle and opined that Sandpoint could not have sustained the pre-abandonment herd with its available feed resources. Reece explained that the Sandpoint ranch, like much of Nebraska, suffered from an "extraordinary" drought in 2012 to 2013. There were extended intervals of extreme to exceptional drought conditions during these years. By April 2013, most of Nebraska suffered from extreme prolonged drought. According to Reece, when rangeland is subjected to drought and overgrazing, heavy infestations of annual weeds will propagate when the drought breaks. This is what Reece observed when he visited the Sandpoint ranch for three days in June 2015. Although cattle can graze in dry locations, he declared that stocking rates must be incredibly low to maintain good stewardship of the rangeland.

In addition to evaluating the Sandpoint ranch pastureland as a food source, Reece also considered the availability of CRP land as a source of feed. He researched the availability of CRP land in Deuel and Cheyenne Counties, considered the CRP

---

[52] Dr. Patrick Reece earned a doctorate in rangeland ecology from Colorado State University in 1978. According to Reece, rangeland ecology is focused on optimizing rangeland ecosystems and the management of livestock. In other words, it involves determining how to graze land to optimize production and sustainability.

From 1978 to 2007, Reece served on the faculty of University of Nebraska, splitting his time evenly between research and extension education. He worked with ranches throughout Nebraska and has experience with registered cattle operations. Currently, Reece consults with ranches on ranch management advisory services and continues to perform educational programs.

contracts Sandpoint made available to him and analyzed the extent to which CRP land could serve as a food source.  He opined that prolonged drought is one of the two major factors affecting forage quality on CRP land.  Based on drought conditions and generally poor forage on CRP land, Reece maintained that moving cattle to CRP land would not satisfy the cattle's nutritional needs without supplements.  He did not consider CRP land to be a primary source for feed.  He referred to CRP land as nothing more than an "exercise lot" for cattle.  He also explained that the availability of CRP land ends on September 30 each year, further limiting the resource.

Additionally, Reece considered Sandpoint's access to pastureland through leases with neighbors, the Widdowsons and John Widdowson's parents.  Based on the limited information provided to him, he opined that the potential capacity of CRP and other leased land as feed sources represented less than ten percent of the feed necessary to meet the nutritional needs of the herd.

Finally, Reece considered Sandpoint's stored corn silage and grain and estimated Sandpoint's access to corn grain harvest, hay and cornstalks after harvest.  These feed sources included 4,500 acres of grass alfalfa mix and hay bales.  Reece considered only the feed Sandpoint could have grown from July 2013 to July 2014 including cornstalks.

Based on his analysis of the nutritional needs of the cattle and feed sources available, Reece concluded that Sandpoint would have had to spend $461,205 on additional feed for the female cattle for one year beginning on July 29, 2013.  The cost of additional feed for calves and bulls would have been $457,582.  Reece used 2013 feed costs to calculate these totals, but these figures do not include transportation or labor costs.  In other words, even if Sandpoint had exhausted its grassland and forage resources, grain inventory, corn, cornstalks, hay, and silage, Sandpoint would have had to spend $920,000 to sustain the herd for one year.[53]

---

[53] Deutsch criticized Reece's conclusions.  He maintained that Reece's cost estimate assumed Sandpoint would have fed most of its cattle with feed purchased from third parties.  Widdowson and Deutsch testified that the Sandpoint feedlot facilities included 3,000 feet of fixed bunks or pens that could be used to feed between 2,500-

### G.    Alleged Damages

In its Second and Third Amended Complaints, Sandpoint alleges that Defendants' negligence caused $5 million in damages.  At trial, witnesses testified about numerous loss calculations and valuation theories.

### 1.    Debt Offset for Value of Cattle

Sandpoint representatives testified that they expected to receive a debt offset equal to appraised value (or some number in between the Sims appraisal and Alger's appraisal, if any) as a result of abandonment.  Deutsch and the Widdowsons claim Sims' appraisal was low but accepted the estimate as an accurate reflection of fair market value.  In several pleadings, at hearings and during the March 2014 trial, Sandpoint argued that the Sims appraisal represented the fair market value of the cattle.  Doc 458.  At the January 2016 trial, Deutsch testified that, from an accountant's standpoint, Sandpoint's injury is the difference between the fair market value[54] and the $3,461,662.77 credit Sandpoint received.  Nevertheless, at the January 2016 trial, Sandpoint offered evidence suggesting the actual market value of its cattle was higher and its losses greater.

For example, Deutsch testified that he reviewed sales data for the same month as the abandonment published by the American Angus Association and learned that the average price for Angus females was $3,569 and the average price for Angus bulls was $4,392.  Sims appraised 501 bulls at an average value of $2,818 each and 1,875 females at an average value of $3,508 each.  Deutsch, therefore, claims that Sims

---

3,000 cattle.  Deutsch explained that feeding cattle using this manner—rather than pasturing them on ranch land or fields with cornstalks—is the most expensive option. Although the Sandpoint ranch had the capacity to feed its herd on the ranch, Deutsch claimed Sandpoint was not "set up" to feed all the cattle on the ranch.  Rather, Sandpoint pastured a limited number of cattle and relied on short-term rentals, CRP land and other feed sources.  Deutsch estimated that the actual cost to feed the cows from August to December 2013 would total between $126,896 (Doc. 408) and $129,000 (Testimony).

[54] Deutsch suggested two fair market value estimates in the context of this testimony: Sims' appraised value estimate ($7,989,950) or Deutsch's estimate based on Sims' appraisal and American Angus Association data ($8,793,000).

undervalued the Sandpoint bulls.  In support of this premise, he also researched average bull sales for the years 2013 and 2014 and learned that the average price for a bull sold during this time period was $4,195.  Using American Angus Association average price data, Deutsch opined that the Sims valuation was $700,000 to $800,000 too low and claimed the cattle abandoned were worth $8,793,000.

Sandpoint also offered sale summary documents from 2008, 2009, 2010, 2012, 2013 and 2015 showing that its cattle sold for average prices ranging between $5,412.07 and $20,419.  Several cattle sold for as much as $100,000 per head.  Doc. 404.  Sandpoint did not offer evidence of some cattle sales in 2011 and 2012.  Deutsch claims the sales excluded were not typical Sandpoint sales because the sales in 2011 were mature dispersal sales and the sales in 2012 included a significant number of cull bulls and recip cows used for factory breeding.  Larson found these sales relevant and testified that the average selling price of Sandpoint females at the 2011 and 2012 annual sales was $2,248.  Doc. 536, Ex. E.

In the March 2013 hearing on the use of cash collateral, Widdowson testified that the average price paid for a Sandpoint bull at the February 2013 sale was $6,102, while the average price for the average Angus bull was $4,000 according to the American Angus Association Journal.  Doc. 471 at 69.  Sandpoint sold 188 bulls at the February 2013 sale.  Id.

Resale data regarding some of the bulls Sandpoint abandoned also supports the proposition that the Sims appraisal was low.  Express Ranches purchased 59 of the Sandpoint bulls that Alger sold in December 2013.  Mark Squires, Vice President of Administration at Express Ranches, testified that Express Ranches purchased the bulls for $111,600.  One bull died.  The cost of 58 bulls totaled $109,725.  Doc. 555.  Squires opined that the price for the bulls was "cheap."  Express Ranches resold the 58 bulls for $198,050, $86,450 more than the original invoice and $88,325 more than the cost of the

58 bulls resold.[55]  Id.  Express Ranches received an average price of $3,414.66 per head for these bulls.

Other evidence suggests that the Sims appraisal was high.  In its June 10, 2014 order, the Court discounted the Sims appraisal, finding the assumptions inflated and the appraisal unreliable.  See Doc. 458 at 10-11 n.7.  Additionally, inventory data and a market value assessment prepared by Widdowson suggest that the Sims appraisal is high.  In Widdowson's opinion, the market value of the Sandpoint inventory totaled $6,637,450 as of January 31, 2013 ($6,149,000 for 2,760 cattle).  Doc. 462.  His estimates are more than one million dollars lower than Sims' estimate.  Burke opined that Widdowson's market value estimate was "relatively close;" he estimated that the value of 2,896 cattle was $6,555,400—also lower than the Sims appraisal.  Doc. 471; Doc. 550.  Likewise, Cotton's appraisal shows values lower than Sims' estimate.  Larson also testified that cattle sales in 2013 showed that the value of Sandpoint's cattle was lower than the Sims appraisal, although Widdowson and Deutsch claimed Larson inappropriately relied on some commercial cattle sales.

Finally, Parker Friedrich,[56] an Angus consultant, opined that the prices Alger received for the sale of the abandoned Sandpoint cattle in December 2013 reflected the fair market value of the cattle at the time.  He also concluded that the Sims estimate was too high given the circumstances at the time of the sale.  Although Friedrich did not personally attend the December 2013 sale, he received marketing information regarding Alger's sale of the abandoned cattle and bought between 30 and 35 head through a

---

[55] Parker Friedrich, an Angus consultant, testified that Express Ranches is at the pinnacle of the registered Angus business.  It advertises a lot and is extremely "visible" at registered Angus sales.  It is one of the largest Angus seed stock operations in the world.  Friedrich explained that the higher sale price Express Ranches received was a product of Express Ranches' reputation, not Sandpoint's genetics.  Express Ranches' goal is to buy an animal for $2,000 and sell it for $4,000.

[56] Parker Friedrich operates an Angus marketing and consulting business. He earned a degree in animal science from East Texas A&M University-Commerce in 1994 and has been involved in the marketing of Angus cattle since 1995.  Friedrich attends an Angus sale almost every weekend and is familiar with the registered Angus cattle business.  Before testifying he had met Widdowson, Alger, Sims, Cotton, Burke and Squires and was familiar with Express Ranches.

consultant.  He learned that, while the Sandpoint cattle offered for sale were not the "upper echelon," the abandoned cattle sold well.[57]  In fact, Friedrich requested his consultant buy three truckloads of cattle at that sale, but he bought only one because cattle sold so well.

Friedrich described a number of circumstances that explain the difference between Sims' estimate of the market value of the Sandpoint cattle and the prices Alger received for these cattle.  He testified that the people involved in the Angus industry are close knit and information is shared among customers and competitors.  He explained that the registered Angus industry is a "people business" and "reputation is key."[58]  Friedrich maintained that the financial condition of a breeder has a big impact on its ability to market and sell cattle.  If a breeder is not financially able to return a favor or warranty the quality or condition of its animals, customers question whether to do business with it.  When a breeder is under financial stress, it creates a negative perception that could impact price.[59]

---

[57] Friedrich opined that, if a breeder owns 3,000 cattle, 10 percent will generate the largest part of its income, 30 percent will sell for somewhere in the middle and 50 percent will sell for just over commercial value.  Friedrich testified that when Alger offered the Sandpoint cattle for sale, people wondered whether Sandpoint kept its best cattle.

[58] Burke echoed this opinion:

Well, when I value a herd of cattle I always say when you go to prepare for a sale it's on a 60/40 basis, 60 percent on the quality of the animals and 40 percent on the person and the people who they represent, because people buy from people that they know and they trust. So trust is a very important part when you're producing feedstock. They've got to believe in your records. They got to believe in the performance, the information that you submit. So integrity of the person is extremely important, and then of course, the quality of the product.

Doc. 471 at 13-14.

[59] Friedrich's opinions regarding financial distress creating a negative perception are consistent with Widdowson's concerns about Sandpoint petitioning for bankruptcy relief.  Widdowson testified that he was "completely opposed" to bankruptcy because of what it would do to Sandpoint's reputation.

Friedrich testified that Sandpoint's bankruptcy created an unknown factor that depressed the value of its cattle.  Buyers worried that Sandpoint's cattle would not be in good shape, although Friedrich heard that the abandoned cattle "looked really good." News of Sandpoint's financial condition created a perception that buyers could "get something good for nothing" so they looked for an opportunity to buy some of the best Sandpoint had to offer for a good price.

Friedrich opined that other factors affected the purchase price of the abandoned cattle.  He noted that there was limited marketing of the cattle and suggested that the cattle may have sold for higher prices had the sale been conducted at the Sandpoint ranch.  According to Friedrich, selling cattle at a breeder's ranch gives buyers a "warm fuzzy" feeling.  Generally, sales at a sales barn garner lower prices because the atmosphere creates a commercial feeling.

According to Friedrich, the ongoing drought also affected registered Angus cattle sales, including the sales of the abandoned cattle.  There were fewer feed sources; many ranchers reduced their herd size to keep operating.  Prices were lower because breeders sold a lot of cattle.

Friedrich noted that Sims appraised the Sandpoint cattle as if they would be sold by a normal company operating smoothly, not a breeder in bankruptcy.  Sims also assumed the cattle would be sold at the Sandpoint ranch, which Friedrich claimed made a difference in their purchase price.  Consequently, Friedrich concluded that the Sims appraisal was not reflective of market value of the Sandpoint cattle in the fall of 2013 under the circumstances of this case.

### 2.    Facts Regarding Other Alleged Business Losses

In addition to the difference between the Sims appraised value and sale value, Sandpoint witnesses also suggested that Defendants' alleged negligence caused other business losses.  Compher testified that Sandpoint lost opportunity costs resulting from the need to restock its herd after abandonment.  He did not itemize these losses.

Deutsch opined that Sandpoint's lost income opportunity costs totaled between $1.3 and $1.7 million between August and December 2013.[60]

Larson noted that Deutsch's projections assumed data not supported by historical information.  He maintained that Deutsch inflated Sandpoint's projected revenue by using an average sale price of $5,122 per head for cattle sales in September through December 2013.  Larson opined that this figure—which is the average selling price for bulls sold in 2014—is not supported by historical data and does not reflect sale prices during the fall of 2013.  He observed that Sandpoint's projected revenue for 2013 was over $4 million, when historical data showed Sandpoint's revenue ranged between $2.2 million to $3 million.[61]

Larson also opined that Deutsch's projected additional feed costs for retaining the full herd were too low.  According to Deutsch's calculations, feed costs (line item 7100) plus additional feed costs (line item 7110) for the months of August 2013 to December 2013 total $366,483.23.  This is roughly half the feed costs Sandpoint actually spent during the first five months of 2013 to feed the same herd.  Sandpoint's average monthly feed costs for the months of January 2013 to July 2013 total $147,919.91.  Deutsch's projections suggest Sandpoint would have only incurred an average of $73,296.65 in feed costs—including the "additional feed costs"—to feed the herd from August to December 2013, which Larson maintained was not supported by

---

[60] Deutsch opined that Sandpoint would have shown "net ordinary income" (as opposed to losses) in the months of September through December 2013 had it not abandoned the cattle.  Doc. 408.  He maintained that by the end of December 2013, Sandpoint would have realized net ordinary income totaling $789,611.73 for the year.  Id.  He suggested that the Court should add this projected net ordinary income of $789,611.73 to the actual losses Sandpoint incurred in 2013 totaling $992,720.40, and award Sandpoint lost opportunity costs in the sum of $1,782,332.13.  When other evidence suggested that the $5,122 price per head he used in his sale projections was too high, he agreed that $4,195 per head was more appropriate, reducing his projected net ordinary income to $405,833.73 and the lost opportunity sum to $1,398,554.13.  See id.  Deutsch's calculations do not include debt service payments to Alger.  See id.

[61] Tax returns show Sandpoint's gross revenue was $2,245,097 for 2012, $3,010,979 for 2011, $2,227,499 for 2010, $2,516,464 for 2009 and $1,281,904 for 2008.  Docs. 298-302.

the data he reviewed.  Larson concluded that after adjusting the inflated income and
underestimated feed costs, the projected profit becomes a significant loss.

Deutsch also claimed that Sandpoint should be awarded damages for the loss of
its herd.  He testified that Sandpoint would have realized a significant economic benefit
to keeping the cattle including the proceeds from the cattle it planned to sell, their
offspring and the retained genetics of the herd.  According to Deutsch, if not for the
abandonment, Sandpoint would still own 2,400 head of Angus cattle that he claims
would have been worth $10 million.  Assuming that the 499 cattle Sandpoint owned
after abandonment were worth an average of $3,500 per head and subtracting this
value (499 multiplied by $3,500 totals $1,746,500) from $10 million, Deutsch concluded
that Sandpoint lost $8,253,500.

## IV.    CONCLUSIONS OF LAW

Under Nebraska law, Sandpoint must prove three elements to succeed on its
professional negligence claim against Craig:  1) Craig's employment, 2) Craig's neglect
of a reasonable duty and 3) Craig's negligence resulted in and was the proximate cause
of loss to Sandpoint.  See Rice v. Poppe, 2016 WL 1719057, at *4 (Neb. Apr. 28, 2016)
(citing Balames v. Ginn, 861 N.W.2d 684, 696-97 (Neb. 2015)).

Craig does not dispute that Sandpoint employed him.  The Court therefore turns
to whether Craig neglected a reasonable duty.  "Attorneys owe their clients the duty to
exercise such skill, diligence, and knowledge as that commonly possessed by attorneys
acting in similar circumstances."  Id. (citing Guinn v. Murray, 837 N.W.2d 805 (Neb.
2013)).  "The general standard of an attorney's conduct is established by law, but
whether an attorney's conduct fell below the standard in a particular case is a question
of fact.  Expert testimony is generally required to show whether an attorney's
performance conformed to the standard of conduct."  Id. (citations omitted).  "To the
extent there is an issue as to what the law was and whether the attorney correctly
advised on such law is a question of law for the court rather than a question of fact to be
submitted to the jury."  Guinn v. Murray, 837 N.W.2d 805, 824 (Neb. 2013) (citing Baker
v. Fabian, Thielen & Thielen, 578 N.W.2d 446, 451 (Neb. 1998)).

However, a critical issue in a legal malpractice case is a question of fact regarding whether the attorney's specific conduct fell below what the attorney's specific conduct should have been in that particular case. While the court might decide that the attorney's advice did not comport with the substance of the law at the time it was given, it is a question of fact whether under the particular circumstance the attorney's conduct was such that the attorney exercised such skill, diligence, and knowledge as that commonly possessed by attorneys acting in similar circumstances.

Id.

"[L]awyers should make their best efforts to ensure that the client does not make a decision until the client has been informed of the relevant considerations." Rice, 2016 WL 1719057, at *4 (citation omitted) (involving a client's decision to settle her case). "[A] client has the ultimate authority to determine the objective of a legal representation. Of course, an attorney should make reasonable efforts to explain the legal consequences of a course of conduct that a client insists upon taking." Balames, 861 N.W.2d at 698 (citations omitted).  Further, a client's understanding of an attorney's advice must be assessed in light of the client's experience in similar transactions generally and his dependence on the attorney's guidance.  Id. at 699 (citation omitted).

## A.   Craig violated the standard of care.

Craig owed a duty to reasonably advise Sandpoint representatives of the legal consequences, risks and benefits of abandonment as well as other legal alternatives. See Rice, 2016 WL 1719057, at *4.  His failure to do so violated the standard of care.

Sandpoint offered evidence that Craig did not provide information about alternatives to abandonment.  Specifically, Deutsch testified that Craig did not suggest Sandpoint search for debtor-in-possession financing, seek a valuation hearing before surrendering the cattle or pursue a sale pursuant to section 363 of the Bankruptcy Code.  Craig does not dispute this testimony.  Instead, he testified that he evaluated the alternatives and he determined that abandonment (without an agreement with Alger regarding disposition of the cattle) was the only appropriate alternative.  Craig maintained that returning cattle through a confirmed plan would take too long because Alger disputed everything and would object to any plan proposed.  He also testified that conducting a sale outside the ordinary course of business under section 363 of the

43

Bankruptcy Code was not a viable option because such a sale would not help with the overpopulation problem and Alger would not agree with this option. Other options required Alger's consent, which Craig was convinced would not be granted.

Even if the Court assumes that Craig's analysis was correct, he owed a duty to Sandpoint to outline these options and to allow Sandpoint representative to reach their own conclusions. He conceded that he did not communicate the risks and benefits of alternatives typically employed in bankruptcy cases to liquidate or transfer collateral. This conduct is particularly egregious given that the legal strategy Sandpoint ultimately employed—abandonment of income-producing assets without an agreement regarding the sum of debt offset—is very uncommon and imprudent according to expert testimony. Craig's failure to advise his clients of the alternatives available violated the standard of care.

Compher, Deutsch and Widdowson also claim Craig did not advise them about the risk that Sandpoint would receive liquidation or "fire sale" value for the cattle abandoned. The Widdowsons, Deutsch and Compher understood that, sometime after the transfer of the abandoned cattle, Sandpoint would receive a debt offset equal to the appraised value of the cattle (or somewhere between Sandpoint's appraisal and Alger's appraisal, if any). They relied on this understanding when authorizing Craig to pursue abandonment. Craig reinforced this understanding in communications with Sandpoint representatives, correspondence with opposing counsel, representations to the Court in hearings and his draft disclosure statement and plan of reorganization. During the January 2016 trial, Craig continued to maintain that the Court should have granted a debt offset equal to appraised value rather than sale proceeds.

The parties and their experts agree that, under section 554 of the Bankruptcy Code, abandoned property is no longer part of the bankruptcy estate and typically reverts to the debtor, subject to any security interests. The creditor may then exercise consensual or nonconsensual remedies to liquidate the collateral. Under Nebraska law, "[e]very aspect of a disposition of collateral, including the method, matter, time, place, and other terms, must be commercially reasonable[.]" Neb. Rev. Stat. U.C.C. § 9-610(b). The creditor must then apply the proceeds from sale or other disposition toward

the outstanding secured obligations.  Neb. Rev. Stat. U.C.C. § 9-615(a)(2) (a secured party must apply proceeds of collection or enforcement toward "the satisfaction of obligations secured by the security interest or agricultural lien[.]").

Craig argues that when Sandpoint delivered the abandoned cattle to Alger, it not only transferred possession and control of the cattle, it also transferred ownership.  It offered evidence that Sandpoint executed Brand Inspector Local Inspection Certificates that transferred ownership to Alger.  Doc. 465.  In his closing brief, Craig claims that "the matter was outside the scope of the UCC" because ownership transferred with the certificates.  Doc. 686 at 22.  More specifically, he argued "a UCC sale amount would not be outcome determinative of the credit Sandpoint would receive."  Id. at 24.  The authority Craig cites does not support this proposition.[62]  It is also contrary to Nebraska

---

[62] Craig cites three cases touching upon the applicability of UCC standards to the cattle sales in this case.  None of them interpret Nebraska law.  None of them support the proposition that the transfer of cattle with brand certificates took the disposition outside the scope of the UCC or that the commercially reasonable sale amount would not be outcome determinative of the credit Sandpoint would receive.  To the contrary, 395 Lampe, LLC v. Kawish, LLC supports the proposition that sale value, not appraised value, governs the sum of the offset. 2014 WL 221814 (W.D. Wa. Jan. 21, 2014)  The court explained:

> The court uses "disposition" to mean an acquisition of collateral that requires a secured party to recognize the proceeds of that acquisition and offset the proceeds against the outstanding debts.

> * * *

> The value of the [collateral] in the abstract means nothing, or at least it has no meaning that parties have explained.  When [the creditor] finally effects a "disposition" of the [collateral], it will realize the proceeds of that "disposition."  It is the amount of those proceeds, not an abstract determination of "value," that will determine to what extent the [debtor's] debts have been diminished.

Id. at *3.

In Fodale v. Waste Management of Michigan, Inc., the Court applied UCC provisions to the creditor's purchase of collateral in satisfaction of debtor's debt.  See 718 N.W.2d 827, 835 (Mich. Ct. App. 2006) (quoting Silverberg v. Colantuno, 991 P.2d 280, 289 (Colo. 1998) (release of collateral to the debtor was not a disposition because "'disposition' of the collateral connotes receipt of 'proceeds.'")).  The opinion did not

law regarding the transfer of record or legal title through a registration or certificate system and a creditor's obligation to dispose of collateral in a commercially reasonable manner and apply sale proceeds toward the secured lien.  Section 9-609(c) provides: "A transfer of the record or legal title to collateral to a secured party under subsection (b)[63] or otherwise is not of itself a disposition of collateral under this article and does not of itself relieve the secured party of its duties under this article."  Neb. Rev. Stat. U.C.C. § 9-619(c).  Accordingly, after the transfer of the cattle and Brand Inspectors Local Inspection Certificates, Alger had a duty to sell or otherwise dispose of the abandoned cattle in a commercially reasonable manner and apply the sale proceeds (less reasonable expenses) toward the satisfaction of Sandpoint's carryback note.  Neb. Rev. Stat. U.C.C. § 9-615(a)(2) (a secured party must apply proceeds of collection or enforcement toward "the satisfaction of obligations secured by the security interest or agricultural lien"); Neb. Rev. Stat. U.C.C. § 9-610(b) (disposition of collateral must be commercially reasonable).  The cash proceeds received at the commercially reasonable sale determined the sum of the debt offset.  This Court is no less convinced of the applicability of the UCC's commercially reasonable standard to Alger's sale of the cattle than the District Court was following the March 2014 trial.  See Doc. 458.

At trial, Craig claimed that, if Alger had decided to keep the cattle rather than sell them, this Court would have had to consider evidence other than actual sales to determine an appropriate debt offset for claim determination purposes.  If that were the case, the commercially reasonable standard would not have applied to such analysis.

---

resolve issues relating to a creditor's sale of collateral after transfer of possession of title. See id.

Likewise, Comer v. Green Tree Acceptance, Inc. does not support Craig's argument.  858 P.2d 560 (Wyo. 1993).  In Comer, the secured creditor repossessed the collateral, sold it, applied the proceeds and then attempted to collect the deficiency from debtor.  Id. at 564.  The court addressed the creditor's right to collect a deficiency under Wyoming law.  Id. at 565.

[63] Subsection (b) of section 9-619 provides, in pertinent part:  "A transfer statement entitles the transferee to the transfer of record of all rights of the debtor in the collateral specified in the statement in any official filing, recording, registration, or certificate-of-title system covering the collateral[.]"  Neb. Rev. Stat. U.C.C. § 9-619(b).

While retaining the cattle was an option available to Alger, so was immediate sale.  In his response to the motion to abandon filed July 19, 2013, Alger notified Sandpoint that it intended to sell the cattle in a "reasonable manner" within 90 to 120 days.  Doc. 339. To the extent Sandpoint or Craig assumed that Alger would keep the cattle, this response signaled otherwise.  Craig and Sandpoint received notice of Alger's intent to sell the cattle five days before the hearing on the motion to abandon—in time to withdraw the motion, if necessary.  Craig knew or should have known that such a sale, if conducted in a commercially reasonable manner, would determine the debt offset Sandpoint would receive.  His failure to advise his clients of the risk that its debt would be offset by the sum received at a commercially reasonable sale (less costs) rather than appraised value of the collateral violated the standard of care.[64]

### B.    Sandpoint failed to meet its burden of showing that Bednar violated the standard of care.

As an associate with Craig/Bednar Law, Bednar's role and function was to provide support work for Craig and his clients.  She researched the law, sorted documents and organized files.

During the January 2016 trial, several witnesses testified that Bednar participated in conversations and telephone conferences with Sandpoint representatives about a number of topics including debt offset and legal research regarding collateral valuation. Sandpoint offered no evidence that Bednar gave advice, made decisions regarding

---

[64] Craig argues that he is entitled to judgmental immunity because it was reasonable to rely on Judge Mahoney's comments at the end of the hearing on the Motion to Compel to support his belief that the Court would determine the value of the cattle as of the date of the transfer, not the date of sale.  Like the District Court, this Court is not convinced that these comments—made more than six weeks after Sandpoint filed its motion to abandon—may be read to sanction or adopt the view that the sum of debt setoff would be determined by considering appraisals rather than sale value.  See Doc. 458 at 10 n.6.  The federal law applicable to abandonment in a bankruptcy context and the Nebraska law applicable to disposition of collateral is well settled.  Judge Mahoney's comments do not negate Craig's duty or excuse his failure to advise his clients of the risk that its debt would be offset by the sum received at a commercially reasonable sale (less costs) rather than appraised value or his failure to advise his clients of the risks and benefits of legal alternatives other than abandonment. Craig is not entitled to judgmental immunity.

legal strategy or assumed a lead counsel role in any of the hearings. Bednar testified that she did not participate in negotiations in the Sandpoint case. She did not recall advising Sandpoint to get an appraisal. Deutsch testified that, while Bednar did not make any affirmative statements about the issues in this case, she did not object to or disagree with Craig's statements. This claim, without more, is not sufficient to show that Bednar violated the standard of care.

Further, neither of Sandpoint's expert witnesses offered an opinion regarding whether Bednar violated the standard of care. As noted above, "[e]xpert testimony is generally required to show whether an attorney's performance conformed to the standard of conduct." Rice, 2016 WL 1719057, at *4 (citations omitted). Accordingly, Sandpoint did not meet its burden of proof. Its claims and causes of action against Bednar are dismissed with prejudice.

### C.    Sandpoint met its burden of showing that Craig's breach of the standard of care was the proximate cause of Sandpoint's losses.

To prevail on its legal malpractice claim, Sandpoint must show that Craig's negligence resulted in and was the proximate cause of loss to Sandpoint. Id. (citing Balames, 861 N.W.2d at 696-97). A plaintiff asserting legal malpractice in a civil case must show that he or she would have obtained a more favorable judgment or settlement in the underlying action but for the attorney's negligence. Gallner v. Larson, 865 N.W.2d 95, 104 (Neb. 2015) (citation omitted); Young v. Govier & Milone, L.P., 835 N.W.2d 684, 694 (Neb. 2013) (footnote omitted).

> "A proximate cause is a cause that produces a result in a natural and continuous sequence and without which the result would not have occurred." Radiology Servs., 780 N.W.2d at 23. To establish proximate cause, a plaintiff "must meet three basic requirements: (1) Without the negligent action, the injury would not have occurred, commonly known as the 'but for' rule; (2) the injury was a natural and probable result of the negligence; and (3) there was no efficient intervening cause." Id. at 24.

Davis v. Miller, 2010 WL 3269775, at *5 (D. Neb. Aug. 17, 2010).

Craig argues that Sandpoint failed to show that it would have obtained a more favorable outcome had it not abandoned the cattle. He claims the evidence shows Sandpoint could not feed the cattle on the ranch and it would have been too difficult and

costly to sustain the cattle off the ranch.  He argues that, even if Sandpoint shows that Craig promised the sum of debt offset would equal appraised value of the cattle, it failed to offer evidence sufficient to show that it would have received a credit equal to appraised value.  Doc. 686 at 50-52; Doc. 688 at 14-15.

Sandpoint argues that if Craig had advised its representatives about the risks of abandonment and explained that it may receive an offset equal to sale proceeds less costs if Alger sold the cattle, it would not have authorized abandonment.  Compher, Deutsch and Widdowson all testified that Sandpoint could have and would have maintained the cattle had they known of the risk that Sandpoint would only receive an offset for the "fire sale" price Alger received when he sold the abandoned cattle. Sandpoint offered evidence that Compher had the resources to supplement operating income if necessary to sustain the herd.

Defendants offered compelling evidence that Sandpoint was struggling financially and would have had difficulty sustaining the full herd until plan confirmation or until cattle prices rose.  Sandpoint's financial records show businesses losses from the year it was formed to the date it requested to abandon cattle.  Sandpoint reported losses ranging from -$828,140 to -$5,562,157 in its 2008 to 2012 tax returns.  Sandpoint's tax returns also reflect significant capital contributions in each of the five years, suggesting cash flow problems.  Deutsch conceded that Sandpoint did not have sufficient cash flow from operations in 2008 to 2012 to service debt obligations to Alger, resulting in payment defaults.

Sandpoint continued to suffer operating losses in 2013.  Sandpoint's monthly operating reports show losses every month from April 2013 to April 2014, except for February 2014.  Consequently, Sandpoint was forced to rely on cash collateral and capital contributions to operate.  Sandpoint's cash flow statements show that, between short-term loans from related entities and capital contributions from members, Sandpoint received $1,142,982 in additional capital from August 2013 to April 2014.

In April and May 2013, Craig communicated with Sandpoint representatives about its bankruptcy exit strategy and a plan of reorganization.  Craig testified that he asked the Widdowsons for one year of cash flow projections showing ongoing

49

operations and profitability.  The information they provided showed that Sandpoint expected the operating losses to continue.  Craig explained that it was difficult to formulate a profitable business model that he could use to prepare a plan that the Court would confirm.  In Craig's view, Sandpoint's business model at the time would "in no way support the confirmation of a plan."

According to Craig, drought was one of Sandpoint's primary concerns and planning around it was one of the main components of Sandpoint's plan of reorganization.  Craig understood that Sandpoint was running out of feed, the cattle overpopulated the ranch, and Widdowson was concerned that the cattle would harm the land.  Craig's understanding is consistent with Widdowson's testimony at the abandonment hearing.  In July 2013, Widdowson testified that he was not able to "use the asset of the land to take care of them just because the land ain't got the grass to do it."  Doc. 474 at 30-31. He also testified that Sandpoint had exhausted its reserves due to the drought and the cattle had to be moved off the ranch.  He clarified that his concern was long term:  "I don't see an end to the drought yet, and once that end comes, we're going to need some time just for adequate or even above-adequate moisture just to let it catch its breath and go."  Id. at 31-32.

At the January 2016 trial, the Widdowsons conceded that the drought created ranch management challenges because the Lodgepole ranch property could no longer support the full herd.  They both maintained that there were other feed source alternatives.

For example, Widdowson claimed CRP land could serve as a feed source. According to Craig, Widdowson said he could not obtain access to CRP land sufficient to solve his problems. Widdowson denies this and maintains that the CRP land Sandpoint used before was not available, but he could find other CRP land.  In July 2013, Widdowson testified:

> We've looked at other things, as far as the CRP and all that kind of stuff, whether that was going to be released again, and yes, it's been released again.  So as I went there and talked to see if that was going to be an option again, they're not going to allow us to go back to the same fields that we grazed the previous year.  So that option, as far as mitigating some of the drought, basically was evaporating on us.

50

Id. at 45-46.  At the very minimum, Widdowson inferred that CRP land, in general, was not an option.  If he knew of the availability of other CRP land, he misled the Court by failing to disclose it in July 2013.  His testimony in January 2016 suggesting that there was other CRP land available is suspect.

Even if the Court were to assume that some CRP land was available, the weight of the evidence shows that this option would not generate much feed.  Based on drought conditions and generally poor forage on CRP land, Reece maintained that moving cattle to CRP land would not satisfy the cattle's nutritional needs without supplements.  He did not consider CRP land to be a primary source for feed.  In fact, he referred to CRP land in Nebraska in 2013 as nothing more than an "exercise lot" for cattle.

Widdowson also testified that Sandpoint had leased pastureland from third parties in 2013 and was confident that he could secure more land through his network of contacts.  In early June 2013, Widdowson was still searching for land to lease.  Sandpoint had already leased the Widdowsons' land, John Widdowson's parents' land and land owned by at least one third party who agreed to allow only 249 head to graze for 80 days.  It is apparent that he was still in search of more pastureland to lease, but there is no evidence that such land would have been available in late summer and fall.  He offered no specific information about potential leases at trial and testimony from Reece suggests that land near the Sandpoint ranch—and most of Nebraska—was suffering from extreme prolonged drought.  Reece considered Sandpoint's access to pastureland through leases with neighbors and the Widdowson family.  Based on the limited information provided to him, he opined that the potential capacity of CRP and other leased land as feed sources represented less than ten percent of the feed necessary to meet the nutritional needs of the herd.

Widdowson testified about the availability of stored grain, silage and cornstalk grazing but, based on his testimony at the abandonment hearing, it appears that all of Sandpoint's resources were not sufficient to sustain the full herd.  He stated:

> We've used up every bit of extra resource that we've had to maintain the collateral to the best of our ability and also protect the collateral and the asset of the land.  But we're at that point in time where some drastic

changes need to be made.  We cannot hold it together with the current
beating situation that we're in.

Id. at 15-16.  Reece's testimony certainly supports this proposition.  He opined that, even

if Sandpoint had exhausted its grassland and forage resources, grain inventory, corn,

cornstalks, hay, and silage, Sandpoint would have had to spend $920,000 to sustain the

herd for one year.

All of this evidence supports Defendants' argument that Sandpoint could not

sustain the cattle on the ranch and it would have been difficult and costly to sustain the

cattle off the ranch or to purchase feed for the cattle.  Defendants ignore one critical

fact, however.  Compher had the resources to supplement operating expenses, and the

evidence shows he was willing to contribute capital when necessary.  Compher funded

Sandpoint's settlement offer to Craig, paid operating suppliers before bankruptcy, paid

Craig's retainer, provided operating income when Sandpoint struggled with cash

collateral hearings and agreed to provide capital to fund Sandpoint's plan of

reorganization.  His testimony regarding his assets and income and his financial

statements support the proposition that he was in a financial position that allowed him to

contribute to Sandpoint when necessary.  Based on Compher's testimony, financial

statements and evidence showing his ongoing willingness to contribute capital, the

Court finds that Sandpoint could have sustained the cattle for at least a year, allowing

time to determine the sum of Alger's claim, conduct sales as necessary and confirm a

plan.

The Court also finds that, by sustaining the cattle for approximately a year,

Sandpoint would have had the opportunity to sell its cattle using standard marketing

practices, including selling cattle in smaller groups, advertising using the methods

Sandpoint employed in the past, selling the cattle under the Sandpoint name and at the

Lodgepole ranch.  Based on testimony and appraisals from Sims, Widdowson, Deutsch

and Friedrich, Sandpoint would have realized higher sale prices for the abandoned

cattle if such standard marketing techniques had been used.  Accordingly, the Court

finds that Sandpoint met its burden of showing that it would have received a more

favorable outcome but for Craig's failure to inform Sandpoint representatives about the

risk and benefits of abandonment as well as other legal alternatives.

**D.**    **Sandpoint met its burden of showing that it is entitled to damages resulting from Craig's breach of duty.**

"'The general measure of damages in a legal malpractice action is the amount of loss actually sustained by the claimant as a proximate result of the attorney's conduct.'" Black v. Shultz, 530 F.3d 702, 709 (8th Cir. 2008) (quoting Bellino v. McGrath North Mullin & Kratz, PC LLO, 738 N.W.2d 434, 445 (Neb. 2007)).  A trier of fact may award only those damages that are the probable, direct and proximate consequence of the negligent conduct.  Bedore v. Ranch Oil Co., 805 N.W.2d 68, 87 (Neb. 2011); see also West Plains, L.L.C. v. Retzlaff Grain Co. Inc., 2016 WL 3387165, at *3 (D. Neb. May 9, 2016) (citation omitted).  "A plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages." Shipler v. Gen. Motors Corp., 710 N.W.2d 807, 839 (Neb. 2006) (citing Pribil v. Koinzan, 665 N.W.2d 567 (Neb. 2003)).  "Proof of damages to a mathematical certainty is not required, but a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness." Id. (citations omitted).

In its closing briefs, Sandpoint offers a number of arguments supporting its claim for damages which the Court finds present two theories of recovery.  The first is premised on the proposition that transferring 2,376 cattle to Alger should have resulted in a debt offset of $7 million to $8 million if Craig's legal advice had been correct.  In its Complaint, it seeks damages for the difference between sale value and the appraised value of the cattle, which it claimed at trial represented the low end of fair market value. Under this theory of recovery, Sandpoint claims it is entitled to at least $7,979,950 (Sims' appraised value) less $4,677,348.88 in sale proceeds Alger received for total damages of $3,302,601.12.[65]

---

[65] In its closing brief, Sandpoint asserts:  "The amount of damages to which Sandpoint is entitled is the difference between the fair market value of the cattle (which should have been the amount of the credit against the debt) and the amount of credit against the Alger debt that resulted from Alger's 'commercially reasonable' sale under UCC."  Doc. 687 at 46.  Although not included as part of their Complaint or referenced

Sandpoint's second theory of recovery is premised on the proposition that, if Craig had advised it about the risk that it would not receive a debt offset equal to fair market value or if Craig had suggested and explained legal alternatives other than abandonment, it would not have abandoned the cattle.  Under this theory, Sandpoint claims it is entitled to damages for lost income totaling $1,782,332.13 for the months of August through December 2013 as well as the value of the cattle it abandoned, which Deutsch opined was $8,253,500.

Sandpoint argues that it should be entitled to damages for both theories of recovery.  In other words, Sandpoint claims the Court should add the alleged loss of $3,302,601.12 to its lost income opportunity costs and lost income-producing cattle and award it $13,338,433.15.  The Court is not persuaded.  As Defendants noted, Sandpoint's remedies are mutually exclusive.  It is entitled to either the difference between fair market value and sale value under the first theory or lost income opportunity costs and/or compensation for the loss of its herd under the second theory. It is not entitled to both.  Therefore, the Court will analyze the two theories of recovery separately.

### 1.    Sandpoint is not entitled to damages under its first theory of recovery.

Sandpoint's first theory of recovery is premised on the assumption that it would receive an offset equal to the fair market value of the cattle (less sale expenses).

---

in testimony regarding Craig's representations, Sandpoint now claims that Sandpoint should receive credit for the expenses incurred by Alger.  In other words, Sandpoint is seeking damages for the difference between the debt offset it expected to receive and the debt offset it actually received ($3,461,662.77)—not the difference between fair market value and sale value as pled and explained at trial.  The District Court determined the debt offset Sandpoint was entitled to receive in its opinion ruling on Sandpoint's objections to Alger's proofs of claim.  See Doc. 458.  The District Court considered Alger's costs of sale and attorney's fees and determined the appropriate sum that should be deducted from sale proceeds and credited toward Sandpoint's debt to Alger.  Sandpoint offered no evidence suggesting these expenses and offsets would have been different if the proceeds from Alger's sales had totaled $7,979,950 or more (the sum Sandpoint claims it was promised).  The Court is bound by the District Court's conclusion that Alger's expenses were reasonable.  Sandpoint's request for credit for Alger's sale expenses is rejected.

Sandpoint assumes there is a difference between the sale proceeds Alger received and fair market value.  In fact, it argues that fair market value at the time of the abandonment was at least $7.9 million.  Sandpoint's argument is rejected.

At the March 2014 trial on Sandpoint's objections to Alger's proofs of claim, Sandpoint offered the Sims appraisal as evidence of the fair market value of the abandoned cattle.  The District Court found this appraisal and others offered by Sandpoint to be of little use in determining the value of the abandoned cattle.  It concluded:  "At the end of the day, the best measure of value is the amount the cattle were sold for in a commercially reasonable manner or should have been sold for if a sale was not commercially reasonable."  Doc. 458 at 10 n.6.  The District Court considered all relevant factors affecting the cattle sale, including the circumstances of the transfer that made it virtually impossible for Alger to sell the cattle using standard marketing practices and Sandpoint's refusal to allow Alger to sell the cattle at the Sandpoint ranch or under Sandpoint's name.  It determined that Alger sold all but 38 cattle in a commercially reasonably manner and granted a debt offset based on sale proceeds, rather than Sandpoint's appraisers' market value estimates.[66]

Offering much of the same evidence at the January 2016 trial, Sandpoint invites this Court to revisit this conclusion.  The Court declines for two reasons.  First, the Court is bound by the District Court's conclusion that sale price was the best measure of the value of the abandoned cattle at the time they were sold.  Second, the evidence received at the January 2016 trial supports this conclusion.  Sims, Deutsch and Widdowson based their market value estimates on standard marketing conditions not present in this case.  The evidence shows that the market conditions for selling cattle during the fall of 2013 were not ideal.  The drought prompted many breeders to sell

---

[66] Specifically, the District Court concluded that Alger sold all the abandoned cattle in a commercially reasonable manner except 38 fall-bred heifers that Raymar Farms kept.  The District Court found it was commercially unreasonable for Alger to make a unilateral decision to keep these 38 heifers without consulting Sandpoint, but ultimately concluded that the price Alger paid for the cattle was appropriate and did not grant Sandpoint an additional offset for these cattle.  The District Court added the sum Alger agreed to pay for the 38 fall-bred heifers to the total sale proceeds, deducted costs of sale and granted Sandpoint an offset totaling $3,461,662.77.  Doc. 458 at 9-33.

cattle because the cost of feed was more expensive or simply unavailable.  The flood of cattle on the market lowered cattle prices.  Likewise, the abandonment of cattle in the context of Sandpoint's bankruptcy case did not present ideal selling circumstances.  Alger accepted 2,376 head of cattle within two weeks, forcing him to make prompt decisions about caring for and selling the cattle.  Sandpoint did not permit Alger to sell the cattle at the Lodgepole ranch or to sell the cattle under Sandpoint's name.  According to Friedrich, Sandpoint's bankruptcy depressed the value of its cattle and buyers were unsure about the quality of the Sandpoint cattle Alger sold.  Friedrich testified that, despite this concern, the Sandpoint cattle Alger offered for sale in December 2013 sold well, and he opined that the prices Alger received for the abandoned cattle reflected the fair market value of the cattle.  Based on Friedrich's testimony and other evidence received at trial, the Court finds that the fair market value of the abandoned cattle was the price paid at the commercially reasonable sales.  Sandpoint is not entitled to damages under this theory of recovery.

### 2. Sandpoint met its burden of proving it is entitled to damages under its second theory of recovery.

Sandpoint's second theory of recovery is premised on the proposition that, if Craig had advised it about the risk it would not receive a debt offset equal to appraised value or if Craig had suggested and explained legal alternatives other than abandonment, it would not have abandoned the cattle.  Under this theory, Sandpoint claims it is entitled to damages for lost income opportunity totaling $1,782,332.13 for the months of August through December 2013 as well as the value of the cattle it abandoned which Deutsch opined was $8,253,500. [67]

---

[67] Defendants argue that Sandpoint is not entitled to a remedy for its alleged loss of fair market value and lost profits because this would constitute "double dipping."  Specifically, they assert:  "Consistent with the testimony in this case, confirmed pregnant cows and cows with young calves have a higher fair market value than cows without.  Any profits received by Sandpoint as a result of new calves being sold would necessarily be off-set in a reduction in the fair market value of the mother cow.  Awarding the fair market value for a pregnant cow and then giving Sandpoint profits from the production of that same calf is double-dipping.  More generally, the fair market value of registered cattle builds in a present value calculation of the cow or bull's future production."  Doc. 686 at 42.  Defendants maintain that awarding lost profits and fair

a.   <u>Sandpoint is not entitled to damages based on lost income opportunity.</u>

To prove its claim for lost income opportunity or lost profits, Sandpoint must provide financial data which would permit the Court to estimate actual damages with reasonable certitude and exactness.  <u>Racicky v. Farmland Indus., Inc.</u>, 328 F.3d 389, 397 (8th Cir. 2003) (citing <u>World Radio Labs. v. Coopers & Lybrand</u>, 445 N.W.2d 1, 13 (Neb. 1996); <u>Evergreen Farms v. First Nat'l Bank & Trust Co.</u>, 553 N.W.2d 728, 734 (Neb. 1996)); <u>Aon Consulting, Inc. v. Midlands Fin'l Benefits, Inc.</u>, 748 N.W.2d 626, 642 (Neb. 2008) (citation omitted).  "'The law generally is unfavorable to the recovery of losses of profits in tort actions.'"  <u>Racicky</u>, 328 F.3d at 397 (quoting <u>Triple R Indus., Inc. v. Century Lubricating Oils, Inc.</u>, 912 F.2d 234, 238 (8th Cir. 1990)).  "'[U]nder Nebraska law, the key to establishing lost profits is the establishment of a course of business activity through business records.'"  <u>Id.</u> at 397-98 (quoting <u>Triple R Indus., Inc.</u>, 912 F.2d at 238; <u>Am. Rd. Equip. Co. v. Extrusions, Inc.</u>, 29 F.3d 341, 344 n.2 (8th Cir. 1994); <u>K & R, Inc. v. Crete Storage Corp.</u>, 231 N.W.2d 110, 116 (Neb. 1975)).

In support of its claim for damages resulting from lost income opportunity, Deutsch prepared a spreadsheet showing that Sandpoint could have sustained the full herd and would have realized "net ordinary income" (as opposed to the losses it actually incurred) in the months of September through December 2013 had it not abandoned the cattle.  Doc. 408.  He maintains that, by the end of December 2013, Sandpoint would have realized net ordinary income totaling $789,611.73 for the year.  <u>Id.</u>

The Court finds that Deutsch's calculations lack credibility for several reasons. First, Sandpoint's revenue is not supported by historical data.  Larson observed that Sandpoint's projected revenue for 2013 was over $4 million (during a drought while Sandpoint was in bankruptcy), while historical data shows Sandpoint's revenue ranged between $2.2 million to $3 million.

---

market value would be a windfall.  <u>Id.</u>  The Court agrees.  For reasons stated below, Sandpoint did not meet its burden of proving lost profits.  Defendants' "double-dipping" argument serves as another basis for rejecting this claim.

Looking at specific assumptions Deutsch used in his projections, it appears that Deutsch inflated Sandpoint's projected revenue by using an average sale price of $5,122 per head for cattle sales in September through December 2013.[68] Id.  Larson opined that this figure—which is the average selling price for bulls sold in 2014—is not supported by historical data and does not reflect sale prices during the fall of 2013.  This opinion is buttressed by the Sims appraisal on which Sandpoint relies for its market value estimate.  Sims assumed the average price for the bulls abandoned was $2,818 per head.  Even Express Ranches, which purchased 59 Sandpoint bulls from Alger at the December 2013 sale, realized a lower price per head than Deutsch's projection.  The average price Express Ranches paid for the Sandpoint bulls was $1,891.81 each.  From late December 2013 to November 2014, Express Ranches resold the bulls for an average price of $3,414.66 per head—both prices substantially lower than the price Deutsch used for estimated sales in the fall of 2013.  According to Friedrich, Express Ranches is "the pinnacle of the registered Angus business" that aggressively markets its registered Angus cattle.  Express Ranches sold these bulls under much more favorable marketing conditions yet received $1,700 less per head than Deutsch's projected sale estimates.

The most compelling evidence on this issue is Sandpoint's preabandonment estimate of the value of its cattle.  Widdowson appraised the Sandpoint herd in January 2013 and concluded that the estimated fair market value of 797 of Sandpoint's bulls totaled $1,486,250.  The average price of these bulls is $1,864.81.  Substituting Deutsch's estimate of $5,122 per head with Widdowson's estimate of $1,864.81 per head for bulls reduces Sandpoint's projected ordinary income from $789,611.73 to -$558,864.93.[69]  Substituting Deutsch's estimate of $5,122 per head with Widdowson's estimate of $2,227.90 per head (the average value per head of all

---

[68] Deutsch admitted that this figure was inflated.  He conceded that it was appropriate for the Court to use a sale price of $4,195 per head in lieu of the $5,122 per head price he assumed.

[69] Even if the Court substitutes Deutsch's estimate of $5,122 per head with Express Ranches' average sale price of $3,414.66 per head, Sandpoint's projected ordinary income is reduced from $789,611.73 to $82,772.97.

Sandpoint cattle in January 2013) likewise results in a projected loss in excess of $400,000.

The Court also finds that Sandpoint's projected feed costs are not supported by historical information and lack credibility.  According to Deutsch's calculations, feed costs (line item 7100, Doc. 408) plus additional feed costs (line item 7110, Doc. 408) for the months of August 2013 to December 2013 total $366,483.23.  This is roughly half the feed costs Sandpoint actually spent during the first five months of 2013 to feed the same herd.  Sandpoint's average monthly feed costs for the months of January 2013 to July 2013 total $147,919.91.  Deutsch's projections suggest Sandpoint would have only incurred an average of $73,296.65 in feed costs—including the "additional feed costs"— to feed the herd from August to December 2013, which Larson maintained was not supported by the data he reviewed.  Similarly, Reece opined that Sandpoint would have had to spend $920,000 per year ($76,666 per month) in addition to its grassland and forage resources, grain inventory, corn, cornstalks, hay and silage to sustain the herd. Larson concluded that, after adjusting the inflated income and underestimated feed costs, the projected profit becomes a significant loss.  The Court agrees.  Sandpoint did not offer sufficient evidence to support this tremendous cost savings in feed at a time when Sandpoint was struggling to meet the needs of its herd.

Finally, Sandpoint's financial records show business losses from the year it was formed to the date it requested to abandon cattle.  Sandpoint reported losses ranging from -$828,140 to -$5,562,157 in its 2008 to 2012 tax returns.  Sandpoint's operating reports for the months of April 2013 to August 2013 when Sandpoint abandoned the cattle reflect monthly losses as well.  Sandpoint's historical financial data does not support the projected operating income Sandpoint suggested, and it did not offer evidence sufficient to justify a large deviation.  Accordingly, the Court finds that Sandpoint's claim for lost income is not supported by the evidence.  Sandpoint's prayer for damages based on this theory of recovery is denied.

b.   Sandpoint is entitled to damages for lost market value of the
herd resulting from Craig's advice to abandon the herd.

"'In a negligence case . . . the proper measure of damages is that which will
place the aggrieved party in the position in which he or she would have been had there
been no negligence[.]'" Patterson v. Swarr, May, Smith & Anderson, 473 N.W.2d 94,
100 (Neb. 1991) (ellipsis in original) (quoting Stansbery v. Schroede, 412 N.W.2d 447,
450 (Neb. 1987)).   Sandpoint argues that it should be compensated for the value of the
abandoned cattle because it would not have authorized Craig to pursue abandonment if
Craig had informed Sandpoint representatives of the risks and benefits of abandonment
as well as other legal alternatives.   Sandpoint maintains that it could have and would
have maintained the cattle.   In essence, Sandpoint seeks to recover the fair market
value of the abandoned cattle assuming standard marketing practices would have been
used to sell the cattle but for Craig's breach of the standard of care.   Unlike the analysis
of the first theory of recovery, Sandpoint is seeking to recover the value of the
abandoned cattle, assuming Sandpoint would have sold them under the Sandpoint
name in smaller groups using typical marketing practices.

Deutsch testified that Sandpoint would have realized a significant economic
benefit to keeping the cattle including the proceeds from the cattle it planned to sell,
their offspring and the retained genetics of the herd.   According to Deutsch, if not for the
abandonment, Sandpoint would still own 2,400 head of Angus cattle that he claims
would have been worth $10 million.   He assumed that the 499 cattle Sandpoint owned
after abandonment were worth an average of $3,500 per head, subtracted this value
(499 multiplied by $3,500 totals $1,746,500) from $10 million and concluded that
Sandpoint lost $8,253,500.

Sandpoint offered no specific data supporting Deutsch's opinion that the value of
Sandpoint's herd would have been worth $10 million.   His estimate is unsupported and
speculative.   See Shipler, 710 N.W.2d at 839 ("A plaintiff's evidence of damages may
not be speculative or conjectural and must provide a reasonably certain basis for
calculating damages.").

While speculation regarding the market value of herd is not sufficient to meet its burden of proof, the Court finds that Sandpoint offered evidence sufficient to show that it lost the market value of a portion of its herd as a result of Craig's advice.  Sandpoint established that, if it had not abandoned the herd, it would have marketed its cattle using standard practices and received a higher price than the sum Alger received. Deutsch, Sims, Widdowson and Friedrich all testified that if Sandpoint had sold cattle under its name, it would likely have received higher prices.  Sims and Friedrich opined that, if Sandpoint had sold the cattle at the Lodgepole ranch, its cattle may have sold for higher prices.  These witnesses also agreed that advanced marketing and selling the cattle in smaller groups would have likely resulted in higher prices as well.  The evidence also showed that cattle prices increased in 2014 after the abandoned cattle were sold.  Consequently, there is evidence sufficient to establish that Sandpoint suffered losses as a result of the abandonment.

Under Nebraska law, "[l]ost market value 'is the difference in the market value of the property immediately before and after the injury.'"  Racicky, 328 F.3d at 397 (quoting Shotkoski v. Standard Chem. Mfg. Co., 237 N.W.2d 92, 98 (Neb. 1975)).  At trial, the Court received numerous appraisals and opinions regarding the fair market value of the cattle at or near the time of the abandonment, assuming standard marketing conditions. The Court finds that Widdowson's opinions regarding the fair market value of the herd as of January 2013 is the most persuasive and reliable opinion.  Unlike Sims, Burke or Cotton, who viewed the cattle briefly, Widdowson worked with the cattle on a daily basis. He was Sandpoint's sole managing member and the person to whom Sandpoint representatives looked for operational questions.  According to Deutsch, Widdowson estimated the cattle all the time and his estimates were always reasonable.  Burke also found Widdowson's January 2013 market value estimate to be reasonable.

Widdowson opined that the market value of Sandpoint's full inventory was $6,637,450 as of January 31, 2013, including embryos.  If the "other category" is removed, Widdowson valued 2,760 cattle at $6,149,000.  Because the Court did not receive evidence regarding the specific values of individual cattle, it will use an average price of $2,227.90 ($6,149,000 divided by 2,760) and multiply this figure by 2,376 (the number of abandoned cattle) for a total lost market value of $5,293,490.40.  Sandpoint

received a debt offset in the sum of $3,461,662.77 as a result of Alger's sale; therefore, the Court will deduct this offset from the lost market value total.[70]  Accordingly, Sandpoint is awarded $1,831,827.63 for the lost market value of the abandoned cattle.

## V.    CONCLUSION

The Court considered all other arguments and deems them to be without merit.

For the reasons provided above, it is **ORDERED** that:

1. Defendant's motion for a directed verdict is granted.  Judgment shall be entered in favor of Anna M. Bednar.  Sandpoint's claims and causes of action against Bednar are dismissed with prejudice.

2. Sandpoint is awarded $1,831,827.63 for lost market value resulting from Craig's breach of the standard of care.  Judgment shall be entered in favor of Sandpoint and against Craig and Robert F. Craig P.C. d/b/a Craig/Bednar Law P.C. in the sum of $1,831,827.63.

Dated: July 22, 2016.

*Shon Hastings*

Shon Hastings, Judge
United States Bankruptcy Court

---

[70] Sandpoint established lost market value, which is determined immediately before and after the injury.  The injury occurred when Sandpoint abandoned the cattle upon Craig's advice.  Costs to maintain the cattle after abandonment and costs to sell them are not part of this analysis because returning Sandpoint to the position that it would have been but for Craig's negligence assumes there would have been no transfer to Alger or subsequent sales.  Further, in its ruling on Sandpoint's objections to Alger's proof of claim, the District Court deducted the costs of sale and the costs to maintain the cattle from the sale proceeds and determined the sum of debt offset.  Because the debt offset already reflects these costs, the Court will not deduct the costs from its damages award.